FILED
2015 Jan-27 PM 08:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DENISE B. ALVERSON, on behalf of herself and all others similarly situated; *et al.* | ) ) ) ) | |
| Plaintiffs, | ) ) | 2:14-cv-01620-KOB |
| v. | ) ) | |
| COMMUNITY HEALTH SYSTEMS, INC., *et al.* | ) ) ) | |
| Defendants. | ) | |

## THIRD AMENDED CLASS ACTION COMPLAINT

COME NOW Plaintiffs, individually an on behalf of themselves and all others similarly situated, by and through their attorneys, and file this Third Amended Class Action Complaint against Defendants, on behalf of themselves and all others similarly situated, and hereby allege as follows:

## PARTIES

1.     Plaintiff Denise B. Alverson, individually and as class representative, is a resident of Etowah County, Alabama. Alverson treated at Riverview Regional Medical Center and Gadsden Regional Medical Center at all times material to this Complaint.

2.      Plaintiff Janet F. Bearden, individually and as class representative, is a resident of Etowah County, Alabama. Bearden treated at Gadsden Regional Medical Center at all times material to this Complaint.

3.      Plaintiff Bobbie Jean Richard, individually and as class representative, is a resident of Baldwin County, Alabama. Richard treated at South Baldwin Regional Medical Center and South Baldwin Hospital Group at all times material to this Complaint.

4.      Plaintiff Dallas W. Richard, individually and as class representative, is a resident of Baldwin County, Alabama. Richard treated at South Baldwin Regional Medical Center at all times material to this Complaint.

5.      Plaintiff Robert Cadle, individually and as class representative, is a resident of Calhoun County, Alabama. Cadle treated at Stringfellow Memorial Hospital and Gadsden Regional Medical Center at all times material to this Complaint.

6.      Plaintiff Patricia Saye, individually and as class representative, is a resident of Etowah County, Alabama. Saye treated at Gadsden Regional Medical Center in Gadsden, Alabama and also Gadsden Regional Physician Group Practice LLC in Gadsden, Alabama at all times material to this Complaint.

7.      Plaintiff Cynthia K. Horgan, individually and as class representative, is a resident of Chester County, Pennsylvania. Horgan treated at West Grove

Hospital Company, LLC d/b/a Jennersville Regional Hospital in West Grove, Pennsylvania and with Brandywine Valley Cardiology in West Grove, Pennsylvania at all times material to this Complaint.

8.     Plaintiff Lynda Grantham, individually and as class representative, is a resident of Tom Green County, Texas. Grantham treated at San Angelo Community Medical Center, LLC d/b/a  San Angelo Community Medical Center in San Angelo, Texas and with Community Medical Associates in San Angelo, Texas at all times material to this Complaint.

9.     Plaintiff Martin J. Griffin, individually and as class representative, is a resident of Brevard County, Florida. Griffin treated at Osler Medical Clinics and Wuesthoff Health System in Florida at all times material to this Complaint.

10.     Plaintiff Steve Percox, individually and as class representative, is a resident of Pima County, Arizona. Percox treated with Northwest Medical Center in Tucson, Arizona at all times material to this Complaint.

11.     Plaintiff Joel Lovelace, individually and as class representative, is a resident of Concordia Parish, Louisiana. Lovelace treated at Natchez Community Hospital and Natchez HMA Physician Management LLC in Natchez, Mississippi at all times material to this Complaint.

12.    Plaintiff Crystal Johnson, individually and as class representative, is a resident of Martin County, Kentucky. Johnson treated at Three Rivers Medical Clinics, Inc. in Inez, Kentucky at all times material to this Complaint.

13.    Plaintiff Stephen Ziegler, individually and as class representative, is a resident of Whitley County, Indiana. Ziegler treated at Valparaiso Family Health Center at Porter Hospital in Valparaiso, Indiana at all times material to this Complaint.

14.    Plaintiff Lanny C. Reeves, individually and as class representative, is a resident of Weakley County, Tennessee. Reeves treated at Martin Specialty Clinic in Martin, Tennessee at all times material to this Complaint.

15.    Plaintiff Kristopher J. Byrum, individually and as class representative, is a resident of Snohomish County, Washington. Byrum treated at Rockwood Clinic, P.S. in Spokane, Washington at all times material to this Complaint.

16.    Plaintiff Sarah Truman, individually and as class representative, is a resident of Stark County, Ohio. Truman treated at DHSC, LLC d/b/a Affinity Medical Center in Massillon, Ohio at all times material to this Complaint.

17.    Plaintiff Joshua Capps, individually and as class representative, is a resident of Oklahoma County, Oklahoma. Capps treated at Deaconess Health System, LLC d/b/a Deaconess Family Care - North Portland and Deaconess

Physician Services, LLC in Oklahoma City, Oklahoma at all times material to this Complaint.

18.     Plaintiff Johannes A. Nhete, individually and as class representative, is a resident of Sarpy County, Nebraska. Nhete treated at Petersburg Hospital Company, LLC  d/b/a Southside Regional Medical Center in Petersburg, Virginia at all times material to this Complaint.

19.     Plaintiff Richard Dale Floyd, individually and as class representative, is a resident of Hamilton County, Illinois. Floyd treated at National Healthcare of Mt. Vernon, Inc. d/b/a Crossroads Community Hospital and Crossroads Pulmonology in Mt. Vernon, Illinois at all times material to this Complaint.

20.     Plaintiff Christopher L. Brown, individually and as class representative, is a resident of McNairy County, Tennessee. Brown treated at McNairy Hospital Corporation d/b/a McNairy Regional Hospital in Selmer, Tennessee and Lexington Hospital Corporation d/b/a Henderson County Community Hospital in Lexington, Tennessee at all times material to this Complaint.

21.     Plaintiff Hixie Lewis, individually and as class representative, is a resident of Etowah County, Alabama. Lewis treated at Gadsden RMC at all times material to this Complaint.

22.     Plaintiff Sandra Arevalo, individually and as class representative, is a resident of Benton County, Arkansas. Arevalo treated at Northwest Arkansas Hospitals, LLC d/b/a Northwest Medical Center—Bentonville and Northwest Care Express Rogers at all times material to this Complaint.

23.     Plaintiff Kathleen Lasch, individually and as class representative, is a resident of Kootenai County, Idaho. Lasch treated at Spokane Washington Hospital Company, LLC d/b/a Deaconess Hospital; Spokane Valley Washington Hospital Company, LLC d/b/a Valley Hospital and Medical Center; and Rockwood Clinic, P.S. at all times material to this Complaint.

24.     Plaintiff Michael Gills, individually and as class representative, is a resident of Mercer County, West Virginia. Gills treated at Bluefield Hospital Company, LLC d/b/a Bluefield Regional Medical Center in Bluefield, West Virginia at all times material to this Complaint.

25.     Plaintiff Glenn Davis, individually and as class representative, is a resident of Bennington County, Vermont. Davis treated at Women & Children's Hospital, LLC d/b/a Lake Area Medical Center and Lake Area Physician Services, LLC in Lake Charles, Louisiana at all times material to this Complaint.

26.     Plaintiff Erica Kepler, individually and as class representative, is a resident of Arapahoe County, Colorado. Kepler treated at Rockwood Urology

Center and Rockwood Clinic, P.S. in Spokane, Washington at all times material to this Complaint.

27.    Plaintiff Todd Sandstrom, individually and as class representative, is a resident of Suffolk County, Massachusetts. Sandstrom received a letter from Community Health Systems stating that his PII/PHI was involved in the data breach, but is unable to identify the facility where he treated.

28.    Plaintiff Anthony Maldonado, individually and as class representative, is a resident of Hinds County, Mississippi. Maldonado treated in Jackson, Mississippi at River Oaks Hospital, LLC d/b/a River Oaks Hospital; Madison HMA, LLC d/b/a Madison River Oaks Medical Center; and Jackson HMA, LLC d/b/a Central Mississippi Medical Center at all times material to this Complaint.

29.    Plaintiff Alan Wingard, individually and as class representative, is a resident of McDonald County, Missouri. Wingard treated at Northwest Arkansas Hospitals, LLC d/b/a Northwest Medical Center – Bentonville at all times material to this Complaint.

30.    Plaintiff Dana Klatt, individually and as class representative, is a resident of Salt Lake County, Utah. Klatt treated at Moberly Hospital Company, LLC d/b/a Moberly Regional Medical Center at all times material to this Complaint.

31.    Plaintiff Robert Burns, individually and as class representative, is a resident of Gloucester County, New Jersey. Burns treated at Salem Hospital Corporation d/b/a The Memorial Hospital of Salem County and Salem Clinic Corp. at all times material to this Complaint.

32.    Plaintiff Jessie Dunlap, individually and as class representative, is a resident of Dona Ana County, New Mexico. Dunlap treated at Las Cruces Medical Center, LLC d/b/a Mountain View Regional Medical Center and Ob/Gyn Consultants at all times material to this Complaint.

33.    Plaintiff Karen Menke, individually and as class representative, is a resident of Jackson County, Oregon. Menke treated at Venice HMA, LLC d/b/a Venice Regional Bayfront Health at all times material to this Complaint.

34.    Plaintiff Brandon Mitchem, individually and as class representative, is a resident of Tazewell County, Virginia. Mitchem treated at Bluefield Clinic Company, LLC d/b/a Bluefield Internal Medicine at all times material to this Complaint.

35.    Plaintiff Taylor Somers-Hughes, individually and as class representative, is a resident of London, United Kingdom. Somers-Hughes treated at Tomball Texas Hospital Company, LLC d/b/a Tomball Regional Medical Center at all times material to this Complaint.

36.     Defendant Community Health Systems, Inc. (hereinafter "CHS") is a Delaware corporation with its principal place of business in Tennessee. This Defendant, upon information and belief, does business in Alabama, as well as 28 other states. CHS is the parent company that owns and operates, through subsidiaries, 206 general acute care hospitals in 29 states with approximately 31,000 licensed beds. CHS is, or was at all relevant times, the parent company for the named hospital defendants.

37.     Defendant Community Health Systems Professional Services Corporation (hereinafter "CHSPSC") is a Delaware corporation with its principal place of business in Tennessee. Upon information and belief, CHSPSC does business in Alabama as well as 28 other states.

38.     Defendant Gadsden Regional Medical Center, LLC (hereinafter "Gadsden RMC"), individually and as class representative, is a Delaware company with its principal place of business in Etowah County, Alabama. Gadsden RMC is, or was at all relevant times, a subsidiary of CHS that operates a hospital in Gadsden, Alabama with 346 licensed beds. Gadsden RMC is a member of the CHS Enterprise.

39.     Defendant Riverview Regional Medical Center, LLC (hereinafter "Riverview") is a Delaware company with its principal place of business in Etowah County, Alabama. Riverview is, or was at all relevant times, a subsidiary

of CHS that operates a hospital in Gadsden, Alabama with 281 licensed beds. Riverview is a member of the CHS Enterprise.

40.    Defendant Foley Hospital Corporation (hereinafter "South Baldwin") is an Alabama corporation with its principal place of business in Baldwin County, Alabama. Foley Hospital Corporation does business as South Baldwin Regional Medical Center. South Baldwin is, or was at all relevant times, a subsidiary of CHS that operates a hospital in Foley, Alabama with 112 licensed beds. South Baldwin is a member of the CHS Enterprise.

41.    Defendant Anniston HMA, LLC (hereinafter "Stringfellow") is an Alabama corporation with its principal place of business in Calhoun County, Alabama. Anniston HMA, LLC does business as Stringfellow Memorial Hospital. Anniston HMA, LLC is, or was at all relevant times, a subsidiary of CHS that operates a hospital in Anniston, Alabama with 125 licensed beds. Stringfellow is a member of the CHS Enterprise.

42.    Defendant Affinity Hospital, LLC (hereinafter "Trinity Medical Center") is a Delaware corporation with its principal place of business in Jefferson County, Alabama. Affinity Hospital, LLC does business as Trinity Medical Center. Affinity Hospital is, or was at all relevant times, a subsidiary of CHS that operated a hospital in Birmingham, Alabama with 534 licensed beds. In the aftermath of the data breach, Trinity Medical Center spokesperson Leisha Harris publicized that its

patient records at its affiliated clinics were not included in the PII/PHI accessed, copied, and transferred in the breach.[1] However, Trinity Medical Center played an active role of the CHS Enterprise that is described more fully herein.

43.    Defendant Gadsden Regional Physician Group Practice LLC, individually and as class representative, is a Delaware Limited Liability Company with its principal place of business in Etowah County, Alabama. Gadsden Regional Physician Group Practice LLC is, or was at all relevant times, a subsidiary of CHS and a member of the CHS Enterprise.

## JURISDICTION & VENUE

44.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and it is a class action brought by citizens of a State that is different from the State where at least one of the Defendants is incorporated or does business.

45.    Venue is proper in this judicial district under 28 U.S.C. §1391 because the Defendants do business throughout this district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district. At all times material hereto, Defendants were and are in the business of providing services through general acute care hospitals throughout Alabama, this judicial

---

[1] *See, e.g.*, http://www.bizjournals.com/birmingham/news/2014/08/18/trinity-medical-center-not-affected-by-chs-data.html

district, and in 28 other states, by and through various hospitals operated through subsidiary companies.

46.     Additionally, this Court also has personal jurisdiction over each defendant and venue is proper in this action pursuant to 18 U.S.C. § 1965. Plaintiffs and class members bring a civil RICO action pursuant to 18 U.S.C. § 1964 alleging numerous violations of 18 U.S.C. § 1962 and the acts for each violation occurred in the Northern District of Alabama Southern Division and an agent of the enterprise may be found in the Northern District of Alabama Southern Division.

47.     As pleaded more specifically *infra*, this court has *in personam* jurisdiction over every Defendant under Alabama law's conspiracy jurisdiction because every Defendant has made an overt act in furtherance of the Alabama conspiracy.

## **FACT COMMON TO ALL COUNTS**

48.     This is a consumer class action lawsuit brought by Plaintiffs, individually and on behalf of all other similarly situated persons (i.e., the class members), whose personally identifiable information and personal health information (e.g., patient names, addresses, birthdates, telephone numbers, and social security numbers and, possibly including, patient credit card, medical or clinical information) (hereinafter "PII/PHI") considered protected under the Health

Insurance Portability and Accountability Act ("HIPAA") entrusted to Defendants was stolen, disclosed, and/or made accessible to hackers and identity thieves.

49.    As a result of Defendants' failure to implement and follow basic security procedures, the PII/PHI of 4.5 million patients (including Plaintiffs and the class they seek to represent) is now in the hands of thieves. As a result of Defendants' failure to implement and follow basic security procedures, Plaintiffs suffered actual identity theft when unauthorized third-parties, on two occasions, accesses, transferred, and copied the PII/PHI of 4.5 million patients.

50.    The hackers read and understood Plaintiffs' PII/PHI and liked what they found so much that they came back a second time in June 2014 for more PII/PHI. The hackers deliberately targeted Defendants' computers and servers and spent several months collecting, accessing, and transferring Plaintiffs' PII/PHI. The hackers targeted Plaintiffs' PII/PHI for the sole purposes of misusing it.

51.    Plaintiffs now face a substantially increased risk of additional instances of identity theft and resulting losses, if not additional acts of identity theft and resulting losses. Plaintiffs are immediately and imminently in danger of sustaining some or further direct injury/injuries as a result of the identity theft they suffered when Defendants did not protect and secure their PII/PHI and disclosed their PII/PHI to hackers. These further instances of identity theft are certainly impending and imminent. Unlike other prominent data breaches, the PII/PHI

access, copied, and transferred from Defendants has all of the information wrongdoers need, and the American government and financial system requires, to completely and absolutely misuse Plaintiffs' identity to their detriment.

52.     Consequently, Defendants' patients and former patients have or will have to spend significant time and money to protect themselves; including, but not limited to: the cost of responding to the data breach, cost of conducting a damage assessment, mitigation costs, costs to rehabilitate Plaintiffs' PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

53.     Additionally, as a result of Defendants' failure to follow contractually-agreed upon, federally-prescribed, industry standard security procedures, Plaintiffs received only a diminished value of the services they paid Defendants to provide. Plaintiffs contracted for services that included a promise by Defendants to safeguard, protect, and not disclose their personal information and, instead, Plaintiffs received services devoid of these very important protections.

54.     As a proximate result of Defendants' wrongful acts and omissions, Plaintiffs and the Class members have suffered injury, harm, and damages including but not limited to emotional distress, loss of monies paid to Defendants for services to protect and not disclose PII/PHI, and Plaintiffs and class members have and will have to spend significant time and money to protect themselves; including, but not limited to: the cost of responding to the data breach, cost of

conducting a damage assessment, costs to obtain credit reports, costs to obtain future credit reports, cost for credit monitoring, costs for insurance to indemnify against misuse of identity, costs to rehabilitate Plaintiffs and class members' PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach. All of these damages are fairly traceable to Defendants' actions.

## CHS Hospitals and the Plaintiffs

55.    Plaintiffs and class members are patients and customers of CHS's hospitals and clinics.

56.    The CHS Enterprise spans 29 states and consists of 206 hospitals and hundreds of clinics.

57.    CHSPSC purports to provide management, consulting, and information technology to the hospitals and clinics in the CHS enterprise.

58.    In the regular course of business, Defendants collect and maintain possession, custody, and control of a wide variety of Plaintiffs' PII/PHI, including, but not limited to patient credit card, medical or clinical information and history, patient names, addresses, birthdates, telephone numbers and social security numbers.

59.    When Plaintiffs provided PII/PHI to the respective Hospital Defendant or the Clinic Defendant, Plaintiffs also provided PII/PHI to CHS, CHSPSC, and the entire CHS enterprise.

60.     Plaintiffs and Defendants agreed that, as part of the services provided to Plaintiffs, Defendants would protect Plaintiffs' PII/PHI.

61.     The CHS hospitals and clinics used uniform HIPAA Notices provided to patients at or around the time of contracting and these documents embodied the agreement between the Plaintiffs and Defendants. These documents typically promised, in pertinent part:

> ***We are committed to protecting medical information about you****. . . . **This notice will tell about the ways in which the facility may*** use and ***disclose medical information about you.*** Also described are your rights and certain obligations we have regarding the use and disclosure of medical information.
>
> ***The law requires the facility to:***
>
> ***Make sure that medical information that identifies you is kept private;***
>
> \*\*\*\*
>
> ***We will first obtain your written authorization before*** using or ***disclosing your protected health information for any purpose not described above***, including disclosures that constitute the sale of protected health information or for marketing communications paid for by a third party (excluding refill reminders, which the law permits without your authorization).

(emphasis added).

62.     CHS also stated in its 2013 10-K filed with the Securities Exchange Commission that "We have developed and utilize a HIPAA compliance plan as part of our effort to comply with HIPAA privacy and security requirements. The privacy regulations and security regulations have and will continue to impose significant costs on our facilities in order to comply with these standards."

63.     This promise and agreement to protect Plaintiffs' PII/PHI was a value added to the services provided by Defendants that was considered a benefit of the bargain for which Plaintiffs paid adequate consideration. In other words, Plaintiffs were paying for more than just medical services, they were paying for Defendants' service of protecting, securing, and not disclosing their PII/PHI.

64.     Upon information and belief, a portion of the consideration paid by Plaintiffs was accepted and rendered proceeds by Defendants that was allocated, purportedly, to storing, protecting, and securing PII/PHI and ensuring compliance with HIPAA, the HITECH Act, and DHHS regulations. This allocation was made for the purpose of offering patients and customers, such as Plaintiffs, a value added service, in addition to medical services provided, by promising and agreeing to protect and not disclose PII/PHI. Such services are a value that differentiates the services provided by the CHS Enterprise from black market medical services.

## HIPAA & HITECH ACT Requirements

65.     Under HIPAA and the HITECH Act, Defendants must implement policies and procedures to limit physical access to their electronic information systems and the facility or facilities in which they are housed, while ensuring that properly authorized access is allowed. *See* 45 C.F.R. §164.310.

66.     Specifically, Defendants must ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or

business associate creates, receives, maintains, or transmit; protect against any reasonably anticipated threats or hazards to the security or integrity of such information; protect against any reasonably anticipated uses or disclosures of such information that are not permitted. *See* 45 C.F.R. §164.306.

67.    Defendants must also implement technical policies and procedures for electronic information systems that maintain electronic PII/PHI to allow access only to those persons or software programs that have been granted access rights as specified in 45 C.F. R. §164.308(a)(4). A few of these policies and procedures include, but are not limited to: implementing a mechanism to encrypt and decrypt electronic PII/PHI; implementing hardware, software, and/or procedural mechanisms that record and examine activity in information systems that contain or use electronic PII/PHI; implementing procedures to verify that a person or entity seeking access to electronic PII/PHI is the one claimed; implementing technical security measures to guard against unauthorized access to electronic PII/PHI that is being transmitted over an electronic communications network; implementing security measures to ensure that electronically transmitted electronic PII/PHI is not improperly modified without detection until disposed of. *See* 45 C.F.R. §164.312.

68.    When Defendants permit business associates to create, receive, maintain, or transmit electronic PII/PHI, it must ensure that those business associates comply with HIPAA and the HITECH Act. *See* 45 C.F.R. §164.314.

18

69.     Defendants must also conduct an accurate and thorough assessment of the potential risks and vulnerabilities to the confidentiality, integrity, and availability of electronic protected health information held by the covered entity or business associate; implement procedures to regularly review records of information system activity, such as audit logs, access reports, and security incident tracking reports; and implement **procedures for guarding against, detecting, and reporting malicious software**. *See* 45 C.F.R. §164.308 (emphasis added).

70.     Defendants did not comply with any of the foregoing requirements.

## Defendants Did Not Protect Plaintiffs' PII/PHI

71.     Defendants did not comply with and, therefore, violated HIPAA and the HITECH Act.

72.     Defendants stored Plaintiffs' PII/PHI in an unprotected, unguarded, unsecured, and/or otherwise unreasonably protected electronic and/or physical location.

73.     Defendants did not adequately encrypt, if at all, Plaintiffs' PII/PHI.

74.     Defendants did not provide adequate security measures to protect Plaintiffs' PII/PHI.

75.     Upon information and belief, in the weeks before the first data breach, upper management in the CHS Enterprise received employee e-mails warning of

security vulnerabilities in the CHS Enterprise computer systems and the computer systems that electronically stored PII/PHI.

76.     On April 8, 2014, the FBI issued a Private Industry Notification to the healthcare industry warning, "Cyber actors will likely increase cyber intrusions against health care systems—to include medical devices—due to mandatory transition from paper to electronic health records (EHR), lax cybersecurity standards, and a higher financial payout for medical records in the black market. . . . the health care industry is not technically prepared to combat against cyber criminals' basic cyber intrusion tactics, techniques and procedures (TTPs), much less against more advanced persistent threats (APTs). The health care industry is not as resilient to cyber intrusions compared to the financial and retail sectors, therefore the possibility of increased cyber intrusions is likely. " The notification continued to detail the value of Plaintiffs' PII/PHI: "Cyber criminals are selling the information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft."

77.     For example, upon information and belief, when faced with significant, well-publicized malware threats to their computer systems, Defendants

did not install the appropriate software updates and/or patches in a reasonable time, if at all.

78.    One such threat was the Heartbleed bug that was disclosed and notorious on or about April 9, 2014. The first patch for Heartbleed was available within days of April 9, 2014.  One program, upon information and belief, used by Defendants was Juniper Network's VPN program. This program was particularly vulnerable to Heartbleed and a patch was made available. Even the average person, let alone one of the nation's largest medical enterprises, was cautioned to download and install all software updates and require users to change their password. Upon information and belief, Defendants did not take any precautions to Heartbleed and that ultimately led to a data breach of PII/PHI, including but not limited to the data contained in billing software furnished by Athena Health.

79.    Defendants were breached in or around April 2014. Despite this first breach, Defendants still did not take any precautions and were breached again in or around June 2014. Upon information and belief, the breaches occurred on or about April 16, 2014 and again on or about June 24, 2014.

80.    In or around April 2014 and again in or around June 2014, an "Advanced Persistent Threat" group originating from China accessed, copied, and transferred Plaintiffs' PII/PHI from Defendants.

81.     Upon information and belief, this "Advanced Persistent Threat" group read and understood Plaintiffs' PII/PHI in or around April 2014 and found it so valuable that they struck again in June 2014.

82.     Upon information and belief, both data breaches were solely for the purpose of stealing Plaintiffs' identity by accessing, transferring, and copying the PII/PHI that Defendants electronically stored.

83.     The data accessed, copied, and transferred included information protected under the Health Insurance Portability and Accountability Act ("HIPAA") because it included patient names, addresses, birthdates, telephone numbers, and social security numbers and may have included patient credit card, medical, and/or clinical information.

84.     On or about August 18, 2014, CHS filed a Form 8-K with the United States Securities and Exchange Commission that provided the first notification of the data breach. This filing stated that the data breach "affected approximately 4.5 million individuals." This filing also states that those who are affected were provided services by CHS within the last five years.

85.     Defendants did not promptly notify its patients that were affected by the breach.

86.     Defendants' failure to notify its patients of this data breach in a reasonable time caused Plaintiffs to remain ignorant of the breach and, therefore,

Plaintiffs were unable to take action to mitigate their damages and prevent additional harm.

87.    Upon information and belief, Defendants did not design and implement policies and procedures regarding the security of electronically stored PII/PHI.

88.    If Defendants did design and implement policies and procedures regarding the security of electronically stored PII/PHI, these policies and procedures failed to adhere to reasonable and best industry practices in safeguarding PII/PHI.

89.    Upon information and belief, Defendants failed to encrypt, or adequately encrypt, Plaintiffs' PII/PHI.

90.    Further, Defendants failed to install software updates and/or patches within a reasonable time.

91.    By failing to fulfill their promise to protect Plaintiffs' PII/PHI, Defendants have deprived Plaintiffs' of the benefit of the bargain. As a result, Defendants cannot equitably retain payment from Plaintiffs—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Plaintiffs' information and data.

## INDIVIDUAL FACTS

### Denise B. Alverson

92.     Alverson was a patient at Riverview Regional Medical Center, a member of the CHS Enterprise, on September 26, 2014 and again on October 7, 2013. Alverson provided PII/PHI to Riverview on these dates.

93.     As an essential part of the services provided, Defendants agreed to protect her PII/PHI.

94.     Alverson was a patient at Gadsden Regional Medical Center, a member of the CHS Enterprise, on August 19, 2012; September 10, 2012; September 17, 2012; September 25, 2012; and October 19, 2012. Alverson provided PII/PHI to Gadsden RMC on these dates.

95.     As an essential part of the services provided, Defendants agreed to protect her PII/PHI.

96.     As a result of the data breach, Alverson has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Alverson's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to

rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Janet F. Bearden**

97.    Bearden was a patient at Riverview Regional Medical Center on June 14, 2013; September 12, 2013; December 20, 2013; and January 2, 2014. Bearden provided PII/PHI to Riverview on these dates.

98.    During the time of her hospital treatment, Bearden was referred for or received services from physicians affiliated with the CHS Enterprise; specifically Cardiology Consultants.

99.    Riverview and Cardiology Consultants are both members of the CHS Enterprise.

100.   As an essential part of the services provided, Defendants agreed to protect her PII/PHI.

101.   As a result of the data breach, Bearden has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants— part of which was intended to pay for the administrative costs of data security— because Defendants did not properly secure Bearden's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for

insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Bobbie Jean Richard**

102.   Bobbie Jean Richard has been a patient at South Baldwin Regional Medical Center numerous times in the last five years. Her most recent hospital admission was in February 2014.

103.   As part of her services from at South Baldwin Regional Medical Center, Richard was referred for or received services from physicians affiliated with the CHS Enterprise; specifically, South Baldwin Hospital Group.

104.   South Baldwin Regional Medical Center and South Baldwin Hospital Group are both members of the CHS Enterprise.

105.   Richard provided PII/PHI to South Baldwin and South Baldwin Hospital Group on these dates.

106.   As an essential part of the services provided, Defendants greed to protect her PII/PHI.

107.   As a result of the data breach, Richard has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Richard's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation

costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Dallas W. Richard**

108.   Dallas W. Richard has been a patient at South Baldwin Regional Medical Center, a member of the CHS Enterprise, numerous times in the last five years. His most recent hospital admission was in November 2013. Richard provided PII/PHI to South Baldwin on these dates.

109.   As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

110.   As a result of the data breach, Richard has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Richard's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Robert Cadle**

111.    Robert Cadle has been a patient Stringfellow, a member of the CHS Enterprise, numerous times in the last five years. His most recent hospital admission was in July 2011. Cadle provided PII/PHI to Stringfellow on these dates.

112.   As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

113.   Robert Cadle has been a patient Gadsden RMC numerous times in the last five years. His most recent hospital admission was in April 2010. Cadle provided PII/PHI to Gadsden RMC on these dates.

114.   As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

115.   As a result of the data breach, Cadle has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants— part of which was intended to pay for the administrative costs of data security— because Defendants did not properly secure Cadle's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Patricia Saye**

116.   Patricia Saye has been a patient at Gadsden RMC in the last five years; most recently in December 2013.

117.   As part of her services from Gadsden Regional, Saye was referred for or received services from physicians affiliated with the CHS Enterprise; specifically, Gadsden Regional Physician Practice Group LLC.

118.   Gadsden Regional and Gadsden Regional Physician Practice Group LLC are both members of the CHS Enterprise.

119.   Saye provided PII/PHI to Gadsden RMC and Gadsden Regional Physician Practice Group LLC during the time of services.

120.   As an essential part of the services provided, Defendants agreed to protect her PII/PHI.

121.   As a result of the data breach, Saye has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Saye's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Cynthia K. Horgan**

122.   Cynthia K. Horgan has been a patient at Jennersville Regional Hospital in the last five years.

123.   As part of her services from Jennersville Regional Hospital, Horgan was referred for or received services from physicians affiliated with the CHS Enterprise; specifically, Brandywine Valley Cardiology.

124.   Jennersville Regional Hospital and Brandywine Valley Cardiology are members of the CHS Enterprise.

125.   Horgan provided PII/PHI to Jennersville Regional Hospital and Brandywine Valley Cardiology during the time of services.

126.   As an essential part of the services provided, Defendants agreed to protect her PII/PHI.

127.   As a result of the data breach, Horgan has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Horgan's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Lynda Grantham**

128.   Lynda Grantham has been a patient at San Angelo Community Medical Center in the last five years.

129.   As part of her services from San Angelo Community Medical Center, Grantham was referred for or received services from physicians affiliated with the CHS Enterprise; specifically, Community Medical Associates.

130.   Both San Angelo Community Medical Center and Community Medical Associates are members of the CHS Enterprise.

131.   Grantham provided PII/PHI to San Angelo Community Medical Center and Community Medical Associates during the time of services.

132.   As an essential part of the services provided, Defendants agreed to protect her PII/PHI.

133.   As a result of the data breach, Grantham has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Grantham's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to

rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Martin J. Griffin**

134.   Martin J. Griffin has been a patient at Osler Medical and Wuesthoff Health Systems, both members of the CHS Enterprise, in the last five years.

135.   Griffin provided PII/PHI to Osler Medical and Wuesthoff Health Systems during the time of services.

136.   As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

137.   Griffin still has not received written notice of the data breach.

138.   As a result of the data breach, Griffin has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants— part of which was intended to pay for the administrative costs of data security— because Defendants did not properly secure Griffin's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Steve Percox**

139.   Steve Percox has been a patient at Northwest Medical Center, a member of the CHS Enterprise, in the last five years.

140.   Percox provided PII/PHI to Northwest Medical Center, a CHS affiliate, during the time of services.

141.   As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

142.   Percox still has not received written notice of the breach although his information was, indeed, accessed, transferred, and copied by third parties.

143.   As a result of the data breach, Percox has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Percox's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Joel Lovelace**

144.   Joel Lovelace has been a patient at Natchez Community Hospital in the past five years.

145.  As part of his services from Natchez Community Hospital, Lovelace was referred for or received services from physicians affiliated with CHS; specifically, Natchez Physician Management LLC.

146.  Both Natchez Community Hospital and Natchez Physician Management LLC are members of the CHS Enterprise.

147.  Lovelace provided PII/PHI to Natchez Community Hospital and Natchez Physician Management LLC, CHS affiliates, during the time of services.

148.  As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

149.  As a result of the data breach, Lovelace has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Lovelace's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs toz rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Crystal Johnson**

150.   Crystal Johnson has been a patient at Three Rivers Medical Clinic, a member of the CHS Enterprise, in the last five years.

151.   Johnson provided PII/PHI to Three Rivers Medical Clinic during the time of services.

152.   As an essential part of the services provided, Defendants agreed to protect her PII/PHI.

153.   As a result of the data breach, Johnson has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants— part of which was intended to pay for the administrative costs of data security— because Defendants did not properly secure Johnson's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Stephen Ziegler**

154.   Stephen Ziegler has been a patient at Valparaiso Family Health Center at Porter Hospital, a member of the CHS Enterprise, in the last five years.

155.   Ziegler provided PII/PHI to Valparaiso Family Health Center during the time of services.

156.   As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

157.   As a result of the data breach, Ziegler has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants— part of which was intended to pay for the administrative costs of data security— because Defendants did not properly secure Ziegler's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Lanny C. Reeves**

158.   Lanny C. Reeves has been a patient of Martin Specialty Clinic, a member of the CHS Enterprise, in the last five years.

159.   Reeves provided PII/PHI to Martin Specialty Clinic during the time of services.

160.   As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

161.   As a result of the data breach, Reeves has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants— part of which was intended to pay for the administrative costs of data security—

because Defendants did not properly secure Reeves's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Kristopher J. Byrum**

162.   Kristopher J. Byrum has been a patient at Rockwood Clinic, P.S., a member of the CHS Enterprise, in the last five years.

163.   Byrum provided PII/PHI to Rockwood Clinic, P.S. during the time of services.

164.   As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

165.   As a result of the data breach, Byrum has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Byrum's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Sarah Truman**

166.   Sarah Truman has been a patient at Affinity Medical Center, a member of the CHS Enterprise, in the last five years.

167.   Truman provided PII/PHI to Affinity Medical Center during the time of services.

168.   As an essential part of the services provided, Defendants agreed to protect her PII/PHI.

169.   Truman still has not received written notice of the breach.

170.   As a result of the data breach, Truman has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Truman's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Joshua Capps**

171.   Joshua Capps has been a patient at Deaconess Health System, LLC d/b/a Deaconess Family Care - North Portland in the last five years.

172.   As part of his services from Deaconess Family Care - North Portland, Capps was referred for or received services from physicians affiliated with the CHS Enterprise; specifically, Deaconess Physician Services, LLC.

173.   Deaconess Health System, LLC d/b/a Deaconess Family Care - North Portland and Deaconess Physician Services, LLC are both members of the CHS Enterprise.

174.   Capps provided PII/PHI to Deaconess Health System, LLC d/b/a Deaconess Family Care - North Portland and Deaconess Physician Services, LLC during the time of services.

175.   As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

176.   Capps has never been a victim of identity theft before, but for the CHS data breach his identity would never have been stolen. After the data breach has suffered repeated attempts to again steal his identity including his accounts with Chase Bank, Microsoft, and Twitter. Because the data taken from the CHS data breach was sufficient to allow further incidents of identity theft with Chase Bank, Microsoft, and Twitter, these acts are directly related. Further, because Defendants did not notify Capps of the data breach in a reasonable period of time, he was unable to protect himself from these further incidents of identity theft.

177.   As a result of the data breach, Capps has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Capps's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Johannes A. Nhete**

178.   Johannes A. Nhete has been a patient at Petersburg Hospital Company, LLC d/b/a Southside Regional Medical Center, a member of the CHS Enterprise, in the last five years.

179.   Nhete provided PII/PHI to Southside Regional Medical Center during the time of services.

180.   As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

181.   Starting on August 28, 2014, Nhete began receiving calls from the United Kingdom, China, the Bahamas, and India pretending to be his bank and seeking further credentials for access. This is information that was provided to the CHS Enterprise during the time of service  and, because of the timing of the scams

and nature of the PII/PHI provided to Southside Regional Medical Center, these further attempts at identity theft are directly related to the CHS data breach.

182.   As a result of the data breach, Nhete has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Nhete's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Richard Dale Floyd**

183.   Richard Dale Floyd was a patient at National Healthcare of Mt. Vernon, Inc. d/b/a Crossroads Community Hospital in the last five years.

184.   As part of his services from National Healthcare of Mt. Vernon, Inc. d/b/a Crossroads Community Hospital, Floyd was referred for or received services from physicians affiliated with the CHS Enterprise; specifically, Crossroads Pulmonology.

185.   National Healthcare of Mt. Vernon, Inc. d/b/a Crossroads Community Hospital and Crossroads Pulmonology are both members of the CHS Enterprise.

186.   Floyd provided PII/PHI to National Healthcare of Mt. Vernon, Inc. d/b/a Crossroads Community Hospital and Crossroads Pulmonology at the time of services.

187.   As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

188.   As a result of the data breach, Floyd has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants— part of which was intended to pay for the administrative costs of data security— because Defendants did not properly secure Floyd's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Christopher L. Brown**

189.   Christopher L. Brown was a patient at McNairy Hospital Corporation d/b/a McNairy Regional Hospital and Lexington Hospital Corporation d/b/a Henderson County Community Hospital in the last five years.

190.   McNairy Hospital Corporation d/b/a McNairy Regional Hospital and Lexington Hospital Corporation d/b/a Henderson County Community Hospital are both members of the CHS Enterprise.

191.   Brown provided PII/PHI to McNairy Hospital Corporation d/b/a McNairy Regional Hospital and Lexington Hospital Corporation d/b/a Henderson County Community Hospital at the time of services.

192.   As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

193.   Brown has never been a victim of identity theft before, but for the CHS data breach Brown's identity would have never been stolen. After the data breach he has suffered further instances of identity theft and misuse of his identity and has suffered monetary damages as a result.

194.   In or around July 2014, an unauthorized person attempted to access Brown's accounts with Chase Bank and Wells Fargo Bank.

195.   In or around July 2014, an unauthorized, unknown third-party opened a cellular phone account with Verizon Wireless using Brown's identity. This account required Brown's social security number, which has not been disseminated to unauthorized persons except from the CHS data breach. The unauthorized, unknown third-party has incurred a bill in the amount of $1,000 under Brown's identity. This amount has not been forgiven or reimbursed and Verizon is still attempting to collect this amount from Brown. Further, these fraudulent actions have and continue to affect Brown's creditworthiness and the ability to obtain financing.

196.   In or around July 2014, unauthorized, unknown third-parties used Brown's identity to obtain rental homes located in Virginia, Tennessee, West Virginia, and Hawaii.

197.   As a result of Brown's PII/PHI being in the hands of thieves, multiple inquiries now exist on Brown's credit report, which establishes that further incidents of identity theft and misuse of identity are imminent and also negatively affects Brown's FICO score and creditworthiness.

198.   On or about August 28, 2014, in connection with a credit application with Wells Fargo Bank, Brown learned that his identity had been stolen and misused in July 2014. As a result of the multiple incidents of identity theft and misuse of identity, Brown's credit history, FICO score, and creditworthiness have been negatively impacted and he was denied credit from Wells Fargo Bank.

199.   Brown remains a target for identity theft and misuse of identity. Brown has received telephone calls from a person purporting to be a representative of CHS notifying him of the data breach. However, the unknown caller asks him to provide his social security number and Brown refuses.

200.   To assess, mitigate, rehabilitate, and prevent the identity theft and misuse of identity theft caused by the CHS data breach, Brown has purchased services from Lifelock.

201.   As a result of the data breach, Brown has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants— part of which was intended to pay for the administrative costs of data security— because Defendants did not properly secure Brown's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Hixie Lewis**

202.   Hixie Lewis was a patient at Gadsden RMC, a member of the CHS Enterprise, in the last five years.

203.   Lewis provided Gadsden RMC PII/PHI at the time of services.

204.   As an essential part of the services provided, Defendants agreed to protect her PII/PHI.

205.   Lewis has never been a victim of identity theft before, but for the CHS data breach Lewis's identity would have never been stolen. After the data breach, she has suffered further instances of identity theft and misuse of her identity and has suffered monetary damages as a result.

206.   As a result of Lewis's PII/PHI being in the hands of thieves, multiple inquiries now exist on Lewis's credit report, which establishes that further

incidents of identity theft and misuse of identity are imminent and also negatively affects Lewis's FICO score and creditworthiness.

207.   In or around May 2014, an unauthorized, unknown third-party opened two credit cards with Victoria's Secret using Lewis's identity. These accounts required the use of Lewis's social security number and other PII/PHI that would not have been publicly disseminated but for the CHS data breach. The unauthorized, unknown third-party purchased enough merchandise to use all available credit under both credit cards so that the balance owed on each card is at the maximum balance.   Victoria's Secret continues to send bills to Lewis and attempts to collect the debt from Lewis. Victoria's Secret has not forgiven the debt, has not reimbursed the fraudulent charges, and continues to maintain that Lewis is obligated on the debt. These fraudulent actions have and continue to negatively impact Lewis's FICO score and creditworthiness.

208.   In or around May 2014, an unauthorized, unknown third-party opened a credit card with Chase Bank using Lewis's identity. This account required the use of Lewis's social security number and other PII/PHI that would not have been publicly disseminated but for the CHS data breach. The unauthorized, unknown party has made purchases with the card. Chase continues to send bills to Lewis and attempts to collect the debt. Chase has not forgiven the debt, has not reimbursed the fraudulent charges, and continues to maintain that Lewis is obligated on the

debt. These fraudulent actions have and continue to negatively impact Lewis's FICO score and creditworthiness.

209.   In or around September 2014, Lewis learned of the further incidents of identity theft and misuse of her identity when she was seeking a consumer loan from Republic Finance. As a result of the multiple incidents of identity theft and misuse of her identity, Lewis's credit history, FICO score, and creditworthiness have been negatively impacted and she was denied a consumer loan from Republic Finance.

210.   As a result of the data breach, Lewis has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Lewis's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Sandra Arevalo**

211.   Sandra Arevalo was a patient at Northwest Arkansas Hospitals, LLC d/b/a Northwest Medical Center—Bentonville in the last five years.

212.   As part of her services from Northwest Arkansas Hospitals, LLC d/b/a Northwest Medical Center—Bentonville, Arevalo was referred for or received services from physicians affiliated with the CHS Enterprise; specifically, Northwest Care Express Rogers.

213.   Northwest Arkansas Hospitals, LLC d/b/a Northwest Medical Center—Bentonville and Northwest Care Express Rogers are both members of the CHS Enterprise.

214.   Arevalo provided PII/PHI to Northwest Arkansas Hospitals, LLC d/b/a Northwest Medical Center—Bentonville and Northwest Care Express Rogers at the time of services.

215.   As an essential part of the services provided, Defendants agreed to protect her PII/PHI.

216.   As a result of the data breach, Arevalo has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants— part of which was intended to pay for the administrative costs of data security— because Defendants did not properly secure Arevalo's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Kathleen Lasch**

217.   Kathleen Lasch was a patient at Spokane Washington Hospital Company, LLC d/b/a Deaconess Hospital; Spokane Valley Washington Hospital Company, LLC d/b/a Valley Hospital and Medical Center; and Rockwood Clinic, P.S. in the last five years.

218.   Spokane Washington Hospital Company, LLC d/b/a Deaconess Hospital; Spokane Valley Washington Hospital Company, LLC d/b/a Valley Hospital and Medical Center; and Rockwood Clinic, P.S.  are all members of the CHS Enterprise.

219.   Lasch provided PII/PHI to Spokane Washington Hospital Company, LLC d/b/a Deaconess Hospital; Spokane Valley Washington Hospital Company, LLC d/b/a Valley Hospital and Medical Center; and Rockwood Clinic, P.S. at the time of services.

220.   As an essential part of the services provided, Defendants agreed to protect her PII/PHI.

221.   As a result of the data breach, Lasch has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants— part of which was intended to pay for the administrative costs of data security— because Defendants did not properly secure Lasch's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation

49

costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

## Michael Gills

222.   Michael Gills was a patient at Bluefield Hospital Company, LLC d/b/a Bluefield Regional Medical Center in the last five years.

223.   Bluefield Hospital Company, LLC d/b/a Bluefield Regional Medical Center is a member of the CHS Enterprise.

224.   Gills provided PII/PHI to Bluefield Hospital Company, LLC d/b/a Bluefield Regional Medical Center at the time of services.

225.   As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

226.   Gills has never been a victim of identity theft before, but for the CHS data breach Gills identity would have never been stolen. After the data breach, he has suffered further instances of identity theft and misuse of his identity and has suffered monetary damages as a result; specifically, airline tickets were purchased on his Discover Card.

227.   As a result of the data breach, Gills has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants— part of which was intended to pay for the administrative costs of data security—

because Defendants did not properly secure Gills's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Glenn Davis**

228.  Glenn Davis was a patient at Women & Children's Hospital, LLC d/b/a Lake Area Medical Center in the past five years.

229.  As part of his services from Women & Children's Hospital, LLC d/b/a Lake Area Medical Center, Davis was referred for or received services from physicians affiliated with the CHS Enterprise; specifically, Lake Area Physician Services, LLC.

230.  Women & Children's Hospital, LLC d/b/a Lake Area Medical Center and Lake Area Physician Services, LLC are both members of the CHS Enterprise.

231.  Davis provided PII/PHI to Women & Children's Hospital, LLC d/b/a Lake Area Medical Center and Lake Area Physician Services, LLC at the time of services.

232.  As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

233.   As a result of the data breach, Davis has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Davis's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Erica Kepler**

234.   Erica Kepler was a patient at Rockwood Urology and Rockwood Clinic, P.S.

235.   Kepler provided PII/PHI to Rockwood Urology and Rockwood Clinic, P.S. at the time of services.

236.   Rockwood Urology and Rockwood Clinic, P.S. are both members of the CHS enterprise.

237.   As an essential part of the services provided, Defendants agreed to protect her PII/PHI.

238.   As a result of the data breach, Kepler has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—

because Defendants did not properly secure Kepler's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Todd Sandstrom**

239.  Todd Sandstrom was a patient at a Community Health Systems affiliated facility within the last five years.

240.  Sandstrom provided PII/PHI to Community Health Systems at the time of service.

241.  As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

242.  As a result of the data breach, Sandstrom has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Sandstrom's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to

rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

## Anthony Maldonado

243.   Anthony Maldonado was a patient at River Oaks Hospital, LLC d/b/a River Oaks Hospital; Madison HMA, LLC d/b/a Madison River Oaks Medical Center; and Jackson HMA, LLC d/b/a Central Mississippi Medical Center in the last five years.

244.   River Oaks Hospital, LLC d/b/a River Oaks Hospital; Madison HMA, LLC d/b/a Madison River Oaks Medical Center; and Jackson HMA, LLC d/b/a Central Mississippi Medical Center are all members of the CHS Enterprise.

245.   Maldonado provided PII/PHI to River Oaks Hospital, LLC d/b/a River Oaks Hospital; Madison HMA, LLC d/b/a Madison River Oaks Medical Center; and Jackson HMA, LLC d/b/a Central Mississippi Medical Center at the time of services.

246.   As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

247.   As a result of the data breach, Maldonado has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Maldonado's PII/PHI,

diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach

**Alan Wingard**

248.   Alan Wingard was a patient at Northwest Arkansas Hospitals, LLC d/b/a Northwest Medical Center – Bentonville in the last five years.

249.   Northwest Arkansas Hospitals, LLC d/b/a Northwest Medical Center—Bentonville is a member of the CHS Enterprise.

250.   Wingard provided PII/PHI to Northwest Arkansas Hospitals, LLC d/b/a Northwest Medical Center—Bentonville at the time of services.

251.   As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

252.   As a result of the data breach, Wingard has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants— part of which was intended to pay for the administrative costs of data security— because Defendants did not properly secure Wingard's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for

insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Dana Klatt**

253.   Klatt was a patient at Moberly Hospital Company, LLC d/b/a Moberly Regional Medical Center in the last five years.

254.   Moberly Hospital Company, LLC d/b/a Moberly Regional Medical Center is a member of the CHS Enterprise.

255.   Klatt provided PII/PHI to Moberly Hospital Company, LLC d/b/a Moberly Regional Medical Center at the time of services.

256.   As an essential part of the services provided, Defendants agreed to protect her PII/PHI.

257.   As a result of the data breach, Klatt has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Klatt's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Robert Burns**

258.   Robert Burns was a patient at Salem Hospital Corporation d/b/a The Memorial Hospital of Salem County in the past five years.

259.   As part of his services from Salem Hospital Corporation d/b/a The Memorial Hospital of Salem County, Burns was referred for or received services from physicians affiliated with the CHS Enterprise; specifically, Salem Clinic Corp.

260.   Salem Hospital Corporation d/b/a The Memorial Hospital of Salem County and Salem Clinic Corp. are both members of the CHS Enterprise.

261.   Burns provided PII/PHI to Salem Hospital Corporation d/b/a The Memorial Hospital of Salem County and Salem Clinic Corp. at the time of services.

262.   As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

263.   As a result of the data breach, Burns has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants— part of which was intended to pay for the administrative costs of data security— because Defendants did not properly secure Burns's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for

insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Jessie Dunlap**

264.   Jessie Dunlap was a patient at Las Cruces Medical Center, LLC d/b/a Mountain View Regional Medical Center and Ob/Gyn Consultants in the past five years.

265.   Las Cruces Medical Center, LLC d/b/a Mountain View Regional Medical Center and Ob/Gyn Consultants are both members of the CHS Enterprise.

266.   Dunlap provided PII/PHI to Las Cruces Medical Center, LLC d/b/a Mountain View Regional Medical Center and Ob/Gyn Consultants at the time of services.

267.   As an essential part of the services provided, Defendants agreed to protect her PII/PHI.

268.   As a result of the data breach, Dunlap has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants— part of which was intended to pay for the administrative costs of data security— because Defendants did not properly secure Dunlap's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for

insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Karen Menke**

269.   Menke was a patient at Venice HMA, LLC d/b/a Venice Regional Bayfront Health in the last five years.

270.   Venice HMA, LLC d/b/a Venice Regional Bayfront Health is a member of the CHS Enterprise.

271.   Menke provided PII/PHI to Venice HMA, LLC d/b/a Venice Regional Bayfront Health at the time of services.

272.   As an essential part of the services provided, Defendants agreed to protect her PII/PHI.

273.   As a result of the data breach, Manke was forced to purchase identity protection and monitoring for $15.00 a month and Menke has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Menke's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to

rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

## Brandon Mitchem

274.   Mitchem was a patient at Bluefield Clinic Company, LLC d/b/a Bluefield Internal Medicine in the last five years.

275.   Bluefield Clinic Company, LLC d/b/a Bluefield Internal Medicine is a member of the CHS Enterprise.

276.   Mitchem provided PII/PHI to Bluefield Clinic Company, LLC d/b/a Bluefield Internal Medicine at the time of services.

277.   As an essential part of the services provided, Defendants agreed to protect his PII/PHI.

278.   As a result of the data breach, Mitchem has suffered emotional distress (including exacerbation of a pre-existing anxiety disorder) and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Mitchem's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

**Taylor Somers-Hughes**

279.   Taylor Somers-Hughes was a patient Tomball Texas Hospital Company, LLC d/b/a Tomball Regional Medical Center in the last five years.

280.   Tomball Texas Hospital Company, LLC d/b/a Tomball Regional Medical Center is a member of the CHS Enterprise.

281.   Somers-Hughes provided PII/PHI to Tomball Texas Hospital Company, LLC d/b/a Tomball Regional Medical Center at the time of services.

282.   As an essential part of the services provided, Defendants agreed to protect her PII/PHI.

283.   As a result of the data breach, Somers-Hughes has suffered emotional distress and economic harm, including but not limited to: loss of payment to Defendants—part of which was intended to pay for the administrative costs of data security—because Defendants did not properly secure Somers-Hughes's PII/PHI, diminution in the value of services provided, and future expenses for credit monitoring, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, costs for insurance to indemnify against misuse of identity, costs to rehabilitate PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

## **PLAINTIFF CLASS ALLEGATIONS**

284.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of themselves and a Nationwide Class and, in the alternative as necessary, subclasses defined as follows:

285.    **The Class**: Plaintiffs bring this action on behalf of themselves and a Nationwide Class of similarly situated individuals, defined as follows:

> All individuals in the United States that are current or former customers/patients of CHS and whose PII/PHI was wrongfully accessed, copied, and transferred in the months on or about April 2014 and June 2014.

286.  In the alternative, as necessary, Plaintiffs propose the following subclasses by state:

> All individuals in [NAME OF STATE] that are current or former customers/patients of CHS and whose PII/PHI was wrongfully accessed, copied, and transferred in the months on or about April 2014 and June 2014.

287.  In the alternative, as necessary, Plaintiffs propose the following subclasses by facility (the appropriate CHS owned, operated, leased, managed, controlled, and/or affiliated hospital or clinic):

> All individuals that are current or former customers/patients of CHS who treated at [NAME OF CHS OWNED, OPERATED, LEASED, MANAGED, CONTROLLED AND/OR AFFILIATED HOSPITAL OR CLINIC] and whose PII/PHI was wrongfully accessed, copied, and transferred in the months on or about April 2014 and June 2014.

288.   Excluded from the Plaintiff Class are (i) any judge presiding over this action and members of their families; (ii) Defendants, Defendants' subsidiaries, parents successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and their current or former officers and directors (iii) employees who (a) have or had a managerial responsibility on behalf of the organization, (b) whose act or omission in connection with this matter may be imputed to the organization for purposes of civil or criminal liability, or (c) whose statement may constitute an admission on the part of the organization; (iv) persons who properly execute and file a timely request for exclusion from the Class; (v) the attorneys working on plaintiffs' claims; and (vi) the legal representatives, successors, or assigns of any such excluded persons, as well as any individual who contributed to the unauthorized access of the data stored by Defendants.

289.   **Numerosity.** Members of the Plaintiff Class are so numerous that their individual joinder herein is impracticable.  Although the exact number of Plaintiff Class members and their addresses are unknown to Plaintiffs, they are readily ascertainable from Defendants' records. Upon information and belief, there are at least 4.5 million class members. Class members may be notified of the pendency of this action by mail and/or electronic mail, and supplemented (if deemed necessary or appropriate by the Court) by published notice.

290.   **Typicality**. Plaintiffs' claims are typical of the Plaintiff Class because

Plaintiffs and the Class sustained damages as a result of Defendants' uniform wrongful conduct during transactions with Plaintiffs and the Class.

291.   **Adequacy**. Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs have retained counsel competent and experienced in class action litigation, and Plaintiffs intend to prosecute this action vigorously. The interest of members of the Classes will be treated fairly and adequately protected by Plaintiffs and their counsel.

292.   **Predominance and Superiority:** This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The damages suffered by the individual members of the Class will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' wrongful conduct. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer

management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

293. **Commonality:** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members, and include, but are not limited to:

a.  Whether Defendants were negligent in collecting, storing, protecting, and/or securing Plaintiffs' and the Class members' PII/PHI;

b.  Whether Defendants were wanton in collecting, storing, protecting, and/or securing Plaintiffs' and the Class members' PII/PHI;

c.  Whether Defendants took reasonable steps and measures to safeguard Plaintiffs' and Class members' PII/PHI;

d.  Whether Defendants breached their duty to exercise reasonable care in handling Plaintiffs' and Class members' PII/PHI by storing that information in the manner alleged herein;

e.  Whether Defendants disclosed Plaintiffs' PII/PHI;

f.  Whether Defendants notified Plaintiffs and the Classes of the data breach within a reasonable amount of time;

g.  Whether implied or express contracts existed between Defendants, on the one hand, and Plaintiffs and the Class members on the other;

h.  Whether Plaintiffs and the Classes are at an increased risk of identity theft or other malfeasance as a result of Defendants' failure to protect their PII/PHI;

i.  Whether Defendants stored PII/PHI in reasonable manner under industry standards;

j.  Whether protecting Plaintiffs' PII/PHI was a service provided by Defendants;

k.  Whether Defendants made false promises and statements that they would protect, secure, keep private, and not disclose Plaintiffs' PII/PHI;

l.  Whether Defendants have unlawfully retained payment from Plaintiffs because of Defendants' failure to fulfill their agreement to protect, secure, keep private, and not disclose Plaintiffs' PII/PHI;

m. Whether and to what extent Plaintiffs and the Classes have sustained damages.

n.  Whether Defendants were unjustly enriched;

o.  Whether Defendants violated RICO;

p.  Whether an Enterprise existed;

q.  Whether Defendants participated in the pattern of racketeering activity by either: (1) committing—or aiding, abetting, counseling, commanding, inducing, or procuring the commission of—two or more alleged predicate acts that make up

66

the alleged pattern of racketeering activity; or (2) willfully causing the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity, which, if directly performed, would make up the commission of two or more alleged predicate acts that comprise the alleged pattern of racketeering activity;

      r.  Whether Defendants committed mail fraud;

      s.  Whether Defendants committed wire fraud;

      t.  Whether Defendants violated the Computer Fraud and Abuse Act;

      u.  Whether Defendants violated the FCRA;

      v.  Whether Defendants are a consumer reporting agency.

294.   Plaintiffs reserve the right to revise Class definitions and questions based upon facts learned in discovery;

## HOSPITAL DEFENDANT CLASS ALLEGATIONS

295.   Plaintiffs and class members bring this action pursuant to Fed. R. Civ. P. 23(b)(1), (2), & (3) against a class of Defendants (hereinafter "Hospital Defendant Class" or "Hospital Defendants"); specifically Gadsden Regional Medical Center, LLC, on behalf of itself and a Class of similarly situated entities and, in the alternative as necessary, subclasses defined as follows:

296. **The Class**: Plaintiffs bring this action against Gadsden Regional Medical Center, LLC on behalf of themselves and a Nationwide Class of similarly situated entities, defined as follows:

> Any hospital in the United States that was owned operated, leased, managed, and/or controlled by and/or affiliated with Community Health Systems, Inc. and/or Community Health Systems Professional Services Corporation at any time during the period of April 1, 2009 until August 20, 2014.

297. In the alternative, as necessary, Plaintiffs propose the following Hospital Defendant subclasses:

a. **The Data Breach Subclass (including RICO):**

> Any hospital in the United States that was owned operated, leased, or managed, and/or controlled by and/or affiliated with Community Health Systems, Inc. and/or Community Health Systems Professional Services Corporation whose customers and/or patients' PII/PHI was wrongfully accessed, copied, and transferred in the months on or about April 2014 and June 2014.

b. **The RICO-Only Subclass**

> Any hospital in the United States that was owned operated, leased, managed, and/or controlled by and/or affiliated with Community Health Systems, Inc. and/or Community Health Systems Professional Services Corporation that did not have customers and/or patients whose PII/PHI was wrongfully accessed, copied, and transferred in the months on or about April 2014 and June 2014, but was owned operated, leased, managed, and/or controlled by and/or affiliated with Community Health Systems, Inc. and/or Community Health Systems Professional Services Corporation at any time during the period of April 1, 2004 until August 20, 2014 that had any role whatsoever in the allegations herein pertaining to violations of 18 U.S.C. § 1962.

298.   If necessary, Gadsden Regional Medical Center, LLC should be appointed class representative for The Data Breach Subclass of The Hospital Defendant Class.

299.   If necessary, Affinity Hospital, LLC—if its public statements are true that its patients' PII/PHI was not accessed, copied, and transferred—should be appointed class representative for The Rico-Only Subclass of The Hospital Defendant Class.

300.   Plaintiffs reserve the right to revise Class definitions and questions based upon facts learned in discovery;

301.   **Numerosity.** Members of the Hospital Defendant Class are so numerous that their individual joinder herein is impracticable.  The exact number of class members is known to CHS. Upon information and belief, this class is easily identifiable and consists of at least 206 Hospitals operating in 29 different states.[2] The fact that 206 class members are dispersed across 29 different states makes joinder impracticable and a considerable strain upon judicial resources and judicial economy. All members of the Hospital Defendant Class, upon information and belief, are subsidiaries of Community Health Systems, Inc. but are separate and distinct legal entities. Class members may be notified of the pendency of this

---

[2] A list of most of the class members is contained in CHS's 2013 Form 10-K, the pertinent section is attached hereto as Exhibit A.

action by mail and/or electronic mail, and supplemented (if deemed necessary or appropriate by the Court) by published notice.

302. **Typicality**. Plaintiffs' claims are identical and typical as to each member of the Hospital Defendant Class and the anticipated defenses are identical and typical as to each member of the Hospital Defendant Class. A common nucleus of operative facts exists between the claims brought and all Members of the Hospital Defendant Class. Plaintiffs and the Plaintiff Class Members sustained damages as a result of Members of the Hospital Defendant Class's uniform wrongful conduct. These alleged common issues touch and concern all Members of the Hospital Defendant Class. As a result, the class representative for this class will not be antagonistic to the class and the allegations against it will be typical and similar to the allegations against each class member.

303. **Adequacy**. Defendants are adequate representatives of the Hospital Defendant Class because their interests do not conflict with the interests of the members of the Class they seek to represent. The interest of Members of the Hospital Defendant Class will be treated fairly and adequately protected by Defendants and their counsel. There also exists a juridical link between all Members of the Hospital Defendant Class and the class members are sufficiently related to justify class treatment.

304.   **Commonality:** Common questions of law and fact exist as to all Members of the Hospital Defendant Class and predominate over any questions affecting only individual members. For example, although each Hospital Defendant is a separate and distinct legal entity, they were all members of the CHS Enterprise that funded and shared common resources with CHS and CHSPSC including regulatory compliance and management, consulting, and information technology. As a result, the burden of proof against the class will be common, as will the class's defense to the claims alleged herein.

305. Class treatment under Rule 23(b)(1)(A) is appropriate because prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class. Here, there is a common nucleus of operative fact between all defendants and the claims are common to all defendants. The prosecution of 206 separate class actions would be unduly burdensome, a strain on judicial resources, financially impractical for Plaintiffs and the Plaintiff Class, and create a risk of inconsistent or varying adjudications. If such a class is not certified, Plaintiffs will be in the peculiar position of traveling through state by state with their action being legal in some places and barred in the others. In such a situation, with 206 separate civil actions, if the hospital were to prevail in the first action, the 205 remaining

hospitals could use the first victory to preclude prosecution of the remaining actions. Likewise, if this class is not certified, if Plaintiffs were victorious in the first case, Plaintiffs would not enjoy an aggregated victory against all Hospital Defendants and would be forced to proceed against the remaining 205 Hospital Defendants because prelusion can never run against a party that has not yet had its day in court.

306.   Class treatment under Rule 23(b)(1)(B) is appropriate because prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. For example, CHS, CHSPSC, one of the Clinic Defendants, or one of the Hospital Defendants' statements in one trial may be used as evidence against another of the Hospital Defendants in another trial.

307.   Class treatment under Rule 23(b)(2) is appropriate because the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. As alleged herein, the Hospital Defendants were acting either in concert or individually to administer corporate policies and federal regulatory compliance or achieve federal incentive payments

that required uniform behavior from each Member of the Hospital Defendant Class. Further, each Member of the Hospital Defendant Class played an active and uniform role in the Enterprise in the violations of 18 U.S.C. § 1962 as alleged herein.

308.   Class treatment under Rule 23(b)(3) is appropriate because questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## CLINIC DEFENDANT CLASS ALLEGATIONS

309.   Plaintiffs and class members bring this action pursuant to Fed. R. Civ. P. 23(b)(1), (2), & (3) against a class of Defendants (hereinafter "Clinic Defendant Class" or "Clinic Defendants"); specifically Gadsden Regional Physician Group Practice LLC, on behalf of itself and a Class of similarly situated entities and, in the alternative as necessary, subclasses defined as follows:

310.   **The Class**: Plaintiffs bring this action against Gadsden Regional Physician Group Practice LLC,  on behalf of itself and a Nationwide Class of similarly situated entities, defined as follows:

> Any entity in the United States that was owned operated, leased, managed, and/or controlled by and/or affiliated with Community Health Systems, Inc. and/or Community Health Systems Professional Services Corporation at any time during the period of April 1, 2009 until August 20, 2014.

311.   In the alternative, as necessary, Plaintiffs propose the following Clinic Defendant subclasses:

a.   **The Data Breach Subclass (including RICO):**

Any entity in the United States that was owned operated, leased, managed, and/or controlled by and/or affiliated with Community Health Systems, Inc. and/or Community Health Systems Professional Services Corporation whose customers and/or patients' PII/PHI was wrongfully accessed, copied, and transferred in the months on or about April 2014 and June 2014.

b.   **The RICO-Only Subclass**

Any entity in the United States that was owned operated, leased, managed and/or controlled by and/or affiliated with Community Health Systems, Inc. and/or Community Health Systems Professional Services Corporation that did not have customers and/or patients whose PII/PHI was wrongfully accessed, copied, and transferred in the months on or about April 2014 and June 2014, but was  owned operated, leased, managed, and/or controlled by and/or affiliated with Community Health Systems, Inc. and/or Community Health Systems Professional Services Corporation at any time during the period of April 1, 2004 until August 20, 2014 that had any role whatsoever in the allegations herein pertaining to violations of 18 U.S.C. § 1962.

312.   If necessary, Gadsden Regional Physician Group Practice LLC should be appointed class represented for The Data Breach Subclass of The Clinic Defendant Class.

313.   Excluded from this class are any Members of the Hospital Defendant Class.

314.   Plaintiffs reserve the right to revise Class definitions and questions based upon facts learned in discovery;

315.   **Numerosity.** Members of the Clinic Defendant Class are so numerous that their individual joinder herein is impracticable.  The exact number of class members is known to CHS. Upon information and belief, this class is easily identifiable and consists of a few hundred entities that are CHS subsidiaries or affiliates operating clinics and/or physician practices in 29 different states that provide services to the CHS hospitals or physicians affiliated with CHS.[3] The fact that a few hundred class members are dispersed across 29 different states makes joinder impracticable and a considerable strain upon judicial resources and judicial economy. All members of the Clinic Defendant Class, upon information and belief, are subsidiaries of Community Health Systems, Inc. but are separate and distinct legal entities. Class members may be notified of the pendency of this action by mail and/or electronic mail, and supplemented (if deemed necessary or appropriate by the Court) by published notice.

316.   **Typicality**. Plaintiffs' claims are identical and typical as to each member of the Clinic Defendant Class and the anticipated defenses are identical and typical as to each member of the Clinic Defendant Class. A common nucleus of operative facts exists between the claims brought and all Members of the Clinic Defendant Class. Upon information and belief, all members of the Clinic Defendant Class are affiliated with CHS and CHSPSC provided management, consulting, and

---

[3] A list of most of the class members is contained in CHS's 2013 Form 10-K, the pertinent section is attached hereto as Exhibit A.

information technology services to the Clinic Defendants. Plaintiffs and the Plaintiff Class Members sustained damages as a result of Members of the Clinic Defendant Class's uniform wrongful conduct. These alleged common issues touch and concern all Members of the Clinic Defendant Class. As a result, the class representative for this class will not be antagonistic to the class and the allegations against it will be typical and similar to the allegations against each class member.

317. **Adequacy**. Defendants are adequate representatives of the Clinic Defendant Class because their interests do not conflict with the interests of the members of the Class they seek to represent. The interest of members of the Clinic Defendant Class will be treated fairly and adequately protected by Defendants and their counsel. There also exists a juridical link between all Members of the Clinic Defendant Class and the class members are sufficiently related to justify class treatment.

318. **Commonality:** Common questions of law and fact exist as to all Members of the Clinic Defendant Class and predominate over any questions affecting only individual members. For example, although each clinic defendant is a separate and distinct legal entity, they were all members of the CHS Enterprise that funded and shared common resources with CHS and CHSPSC including regulatory compliance and management, consulting, and information technology.

As a result, the burden of proof against the class will be common, as will the class's defense to the claims alleged herein.

319. Class treatment under Rule 23(b)(1)(A) is appropriate because prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class. Here, there is a common nucleus of operative fact between all defendants and the claims are common to all defendants. The prosecution of a few hundred separate class actions would be unduly burdensome, a strain on judicial resources, financially impractical for Plaintiffs and the Plaintiff Class, and create a risk of inconsistent or varying adjudications. If such a class is not certified, Plaintiffs will be in the peculiar position of traveling through state by state with their action being legal in some places and barred in the others. In such a situation, with a few hundred separate civil actions, if the clinic were to prevail in the first action, the remaining clinics could use the first victory to preclude prosecution of the remaining actions. Likewise, if this class is not certified, if Plaintiffs were victorious in the first case, the Plaintiff would not enjoy an aggregated victory against all Clinic Defendants and would be forced to proceed against the remaining Clinic Defendants because prelusion can never run against a party that has not yet had its day in court.

320.   Class treatment under Rule 23(b)(1)(B) is appropriate because prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. For example, CHS, CHSPSC, one of the Hospital Defendants, or one of the Clinic Defendants' statements in one trial may be used as evidence against another of the Clinic Defendants in another trial

321.   Class treatment under Rule 23(b)(2) is appropriate because the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. As alleged herein, the Clinic Defendants were acting either in concert or individually to administer corporate policies and federal regulatory compliance or achieve federal incentive payments that required uniform behavior from each Member of the Clinic Defendant Class. Further, each Member of the Clinic Defendants Class played an active and uniform role in the Enterprise in the violations of 18 U.S.C. § 1962 as alleged herein.

322.   Class treatment under Rule 23(b)(3) is appropriate because questions of law or fact common to class members predominate over any questions affecting

only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## COUNT ONE

## VIOLATION OF 18 U.S.C. § 1962(a)

323. Plaintiffs adopt and re-allege all paragraphs set forth hereinabove as is fully set out herein.

324. Defendants operated a hospital enterprise that made false promises and statements that it would protect, keep private, and not disclose patient/customer PII/PHI. Defendants had no intention to make the financial investment necessary to protect, secure, keep private, and not disclose patient/customer PII/PHI. However, Defendants made these false statements and promises to entice new and continuing business and to lull former patients/customers into a false sense of security that their PII/PHI was being protected, secured, kept private, and not disclosed. Defendants were motivated by the pursuit of greater financial gain to make false promises and statements, but not make the financial investment necessary to protect, secure, keep private, and not disclose patient/customer PII/PHI. While the pursuit of profit is not a *per se* violation of RICO, Defendants violated RICO by pursuing profit by unlawful means. Under RICO, making false promises and statements by mail and wire is unlawful. Since Defendants used the US Mail and wire to make false promises and

statements that it would protect, secure, keep private, and not disclose patient/customer PII/PHI, they are liable under RICO.

325.   Plaintiffs and Plaintiff Class members bring this count pursuant to 18 U.S.C. § 1964.

326.   The Racketeering Influenced and Corrupt Organizations Act (hereinafter "RICO") provides:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. 18 U.S.C. § 1962(a)

327.   CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants (hereinafter collectively referred to as "Defendants") or, in the alternative, a various combination thereof derived income, either directly or indirectly, from a pattern of racketeering activity.

328.   CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants or, in the alternative, a various combination thereof participated as a principal in the pattern of racketeering activity by either: (1) committing—or aiding, abetting, counseling, commanding, inducing, or procuring the commission of—two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or

(2) willfully causing the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity, which, if directly performed, would make up the commission of two or more alleged predicate acts that comprise the alleged pattern of racketeering activity.

329.   Some part of that income, or proceeds of that income, was used to acquire or maintain an interest in, or to operate, an enterprise. Defendants invested and reinvested this income in the Enterprise, which used such funds to continue the scheme to defraud Plaintiffs and class members into paying monies in exchange for promises to protect, secure, keep private, and not disclose to third-parties PII/PHI. Thus, it is the investment of funds that has harmed Plaintiffs and class members.

330.   That enterprise engaged in, or had some effect upon, interstate or foreign commerce.

331.   CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants are persons, within the meaning of 18 U.S.C.§§1961(3) & 1962(a), that received income derived, directly or indirectly, from a pattern of racketeering activity and used or invested, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate, or foreign commerce.

## The RICO Enterprise

332.   CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants have used an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), to carry out their pattern of racketeering activity. This enterprise consists of CHSPSC, The Hospital Defendants, The Clinic Defendants or, in the alternative, CHSPSC and a various combination of The Hospital Defendants and/or The Clinic Defendants (hereinafter "Enterprise"). This enterprise possessed and continues to possess a common purpose and goal, a membership, organizational structure, and ongoing relationships between CHSPSC, The Hospital Defendants, and The Clinic Defendants with sufficient longevity to permit and enable pursuit of the Enterprise's purpose and long-term objective through a continuous course of conduct that affected and continues to affect interstate or foreign commerce.

333.  The Enterprise exists separate and apart from its pattern of racketeering activity, inasmuch as CHSPSC, The Hospital Defendants, and The Clinic Defendants have multiple goals, not all of which are fraudulent. The lawful activity engaged in by the Enterprise includes ongoing partnerships to operate hospitals and clinics. But CHSPSC, The Hospital Defendants, and The Clinic Defendants have used this enterprise to conduct the related acts of mail and wire fraud comprising the pattern of racketeering activity.

334.   CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants or, in the alternative, CHS, CHSPSC, and a various combination of The Hospital Defendants and/or The Clinic Defendants constitute a "person" under the civil RICO statute because they knowingly and fraudulently conducted and participated in the conduct, the management, and the operation of the Enterprise's affairs, directly or indirectly, through a pattern of racketeering activity. CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants engaged in such unlawful conduct by using the Enterprise to conduct lawful activities as well as to further its fraudulent scheme of causing false and misleading information to be disseminated to patients (whether current or former) by mail, interstate wires, or interstate carriers that CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants would protect, secure, keep private, and not disclose to third-parties PII/PHI. They also caused communications by mail, interstate wires, or interstate carriers to collect monies (under the pretense of invoices, statements, and/or bills for services) that were the object of the enterprise and the ultimate goal of the false and misleading information and services promised but not performed. Pursuit of profit does not violate per se the mail and wire fraud statutes or civil RICO. CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants violated RICO and injured Plaintiffs and class members by reason of their conduct of the Enterprise not to pursue gain, but to do so by unlawful means: to maximize its gain and profit

through a pattern and practice of misrepresentation and concealment of the systematic decisions that placed financial goals above security, safety, and privacy considerations, that was conducted in violation of applicable laws and regulations, that made such operations perilous to the privacy and protection of PII/PHI and deprived Plaintiffs and class members of services that were part of an agreement for which they paid adequate consideration, and that rendered CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants, and the Enterprise unable to prevent, contain, and respond to the resulting data breach and deprivation of services for which Plaintiffs and class members expected and contracted. The income or proceeds from such income that CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants received directly or indirectly from this pattern of racketeering activities was then invested, directly or indirectly, in acquisition of any interest in, or the establishment or operation of, the entities that comprise the enterprise. One such investment, as described in CHS's 2013 10-K filed with the SEC, in the Northern District of Alabama Southern Division is the Birmingham replacement hospital on Highway 280 that is known, or will be known, as Grandview Medical Center. Many more hospitals were built or acquired (such as the acquisition of Health Management Associates) with use income from racketeering activities. Another such way Plaintiffs and Class members have been harmed is that Defendants have taken the income derived from the Enterprise as

described more fully herein and have invested it back in the companies and invested it in staff, inventory, supplies, and material to perpetuate the false promises made the basis of the scheme to defraud. For example, staff, materials, and supplies are necessary to print invoice, statements, and bills mailed to Plaintiffs and class members and also to print the HIPAA Notice and Patients' Rights and Responsibilities. Further, such income was invested and used for website development and hosting that was used to perpetuate the wire fraud alleged herein. Such conduct affected and continues to affect interstate or foreign commerce. Further, such income was invested and used for the purposes of making it appear that the Enterprise had the technological capabilities to protect, secure, keep private, and not disclose PII/PHI.  As the direct, proximate and foreseeable result of this violative pattern of racketeering activities and the data breach it caused, Plaintiffs and the class have been injured and harmed.

## The RICO Predicate Acts

335.   CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants engaged in a fraudulent scheme to defraud Plaintiffs and class members into believing that they would protect, secure, keep private, and not disclose to third-parties their PII/PHI and paying for such services that were not provided.

336.   **Mail Fraud.** For the purpose of devising and carrying out their scheme and artifice to defraud Plaintiffs and class members by false and fraudulent

pretenses, representations, and promises, CHS, CHSPSC, The Clinic Defendants and/or The Hospital Defendants did place in an authorized depository for mail, or did deposit or cause to be deposited with private commercial interstate carriers and knowingly caused to be delivered by the United States postal service, letters, memoranda, and other matters, in violation of 18 U.S.C. § 1341, or aided and abetted in such criminal acts, as previously described, under 18 U.S.C. § 2.

337.  **Wire Fraud.** For the purpose of devising and carrying out their scheme and artifice to defraud Plaintiffs and class members by false and fraudulent pretenses, representations, and promises, CHS, CHSPSC, The Clinic Defendants and/or The Hospital Defendants caused to be transmitted by means of wire communication in interstate commerce, writings, signals and sounds, to wit, interstate electronic mail messages and/or facsimile in violation of 18 U.S.C. § 1343, or aided and abetted in such criminal acts, as previously described, under 18 U.S.C. § 2.

338.  Examples of these predicate acts of mail and wire fraud include, but are not limited to (upon information and belief, numerous others will be identified in the process of discovery), the following:

a.  CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants all used the United States mail, a private courier, or interstate or international wires to provide HIPAA notices promising to protect, secure, keep private, and not

disclose to third-parties Plaintiffs and class members' PII/PHI. Each and every one of the Hospital Defendants published such notices on their webpage by means of wire communication in interstate commerce. Such notices were identical or, in the alternative, all notices were identical except for a few that were almost identical. These documents were false and contained false statements and misrepresentations.

b. For example, Trinity Medical Center published on its website[4] on or about September 23, 2013 a HIPAA notice that makes the following false statements and misrepresentations:

- "We are committed to protecting medical information about you."

- "This notice will tell about the ways in which the facility may use and disclose medical information about you."

- "We will first obtain your written authorization before using or disclosing your protected health information for any purpose not described above, . . ."

- "We will notify you if we discover a breach of your unsecured protected health information."

---

[4] http://www.trinitymedicalonline.com/trinity-medical-center/hipaa1.aspx

- "The law requires the facility to: Make sure that medical information that identifies you is kept private; . . . and Follow the terms of the notice that is currently in effect."

c.  For example, Gadsden Regional Medical Center published on its website[5] on or about September 23, 2013 a HIPAA notice that makes the following false statements and misrepresentations:

- "We are committed to protecting medical information about you."

- "This notice will tell about the ways in which the facility may use and disclose medical information about you."

- "We will first obtain your written authorization before using or disclosing your protected health information for any purpose not described above, . . ."

- "We will notify you if we discover a breach of your unsecured protected health information."

- "The law requires the facility to: Make sure that medical information that identifies you is kept private; . . . and Follow the terms of the notice that is currently in effect."

---

[5] http://www.gadsdenregional.com/gadsden-regional-medical-center/hipaa1.aspx

d.  For example, Wuesthoff Health System published on its website[6] on or about September 23, 2013 a HIPAA notice that makes the following false statements and misrepresentations:

- "We are committed to protecting medical information about you."

- "This notice will tell about the ways in which the facility may use and disclose medical information about you."

- "We will first obtain your written authorization before using or disclosing your protected health information for any purpose not described above, . . ."

- "We will notify you if we discover a breach of your unsecured protected health information."

- "The law requires the facility to: Make sure that medical information that identifies you is kept private; . . . and Follow the terms of the notice that is currently in effect."

e.  CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants all used the United States mail, a private courier, or interstate or international wires to provide a document entitled "Patient Rights and Responsibilities" promising to protect and not disclose to third-parties Plaintiffs and class members' PII/PHI. Each and every one of the Hospital Defendants published this document on their

---

[6] http://www.wuesthoff.com/terms/Notice%20of%20Privacy%20Practices

webpage by means of wire communication in interstate commerce. Such documents were identical or, in the alternative, all notices were identical except for a few that were almost identical but make the same materially false statements and promises. Such documents were false and contained false statements and misrepresentations.

     f.  For example, Riverview Regional Medical Center published on its website,[7] on a date to be determined in discovery, a document entitled "Patient Rights and Responsibilities" that makes the following false statements and misrepresentations:

> • "The following reflects patient rights and responsibilities as we join in a partnership with you to provide excellent patient care. Patients have the right to: Security and safety, personal privacy, and confidentiality of information.  Patient information is limited to those individuals designated by law, regulation, and policy or duly authorized as having a need to know or granting of permission by patient."

     g.  For example, South Baldwin Regional Medical Center published on its website,[8] on a date to be determined in discovery, a document entitled "Patient Rights and Responsibilities" that makes the following false statements and misrepresentations:

---

[7] http://www.riverviewregional.com/patients-and-visitors/patient-rights-and-responsibilities

[8] http://www.southbaldwinrmc.com/South-Baldwin-Regional-Medical-Center/PatientRightsandResponsibilities.aspx

- "You have the right to: Personal privacy, privacy of your health information and to receive a notice of the facility's privacy practices.

h.   In the alternative, Defendants' use of the United States mail, a private courier, or interstate or international wires to provide Plaintiffs and class members with documents entitled HIPAA Notice and Patient Rights and Responsibilities was designed to lull Plaintiffs and class members into a false sense of security that their PII/PHI would be protected by Defendants and would not be disclosed to third-parties.

i.   In furtherance of and to generate income from the scheme to defraud, CHS, CHSPSC, and The Clinic Defendants, and/or The Hospital Defendants used the used the United States mail, a private courier, or interstate or international wires in a routine and/or daily practice to deliver invoices, bills, and/or statements, however entitled, for services to Plaintiffs and class members. Such invoices, bills, and/or statements seeking fees that Plaintiffs and class members purportedly owed for services that Defendants' purported to have performed but did not actually perform, such as protecting and not disclosing to third-parties PII/PHI.

j.   In furtherance of the scheme to defraud, CHS, on or about February 26, 2014, used the used the United States mail, a private courier, or interstate or international wires to deliver its 2013 10-k to the Securities Exchange Commission and publically on its website. That document contained false statements and/or

misrepresentations, including: "We have developed and utilize a HIPAA compliance plan as part of our effort to comply with HIPAA privacy and security requirements. The privacy regulations and security regulations have and will continue to impose significant costs on our facilities in order to comply with these standards."

k.  In furtherance of the scheme to defraud, CHS, on or about February 27, 2013, used the used the United States mail, a private courier, or interstate or international wires to deliver its 2012 10-k to the Securities Exchange Commission and publically on its website. That document contained false statements and/or misrepresentations, including: "Our company-wide compliance program has been in place since 1997. . . . Specific written policies, procedures, training and educational materials and programs, as well as auditing and monitoring activities, have been prepared and implemented to address the functional and operational aspects of our business. . . . Another focus of the program is the interpretation and implementation of the HIPAA standards for privacy and security." and "We have developed and utilize a HIPAA compliance plan as part of our effort to comply with HIPAA privacy and security requirements."

l.  In furtherance of the scheme to defraud, CHS, on or about February 22, 2012, used the used the United States mail, a private courier, or interstate or international wires to deliver its 2011 10-k to the Securities Exchange Commission

and publically on its website. That document contained false statements and/or misrepresentations, including: "We have developed and utilize a HIPAA compliance plan as part of our effort to comply with HIPAA privacy and security requirements."

      m. The Enterprise is a costly endeavor and needed to generate revenue to continue the racketeering activities. Upon information and belief, in an effort to fund its scheme to defraud Plaintiffs and class members, CHS, CHSPSC, the Hospital Defendants, and The Clinic Defendants or, in the alternative, a various combination thereof increased revenues by inappropriately increasing inpatient admissions to its hospitals from emergency room operations by admitting patients who should have been released following their ER visits, and for whom Medicare and Medicaid programs never should have been billed. Among the services for which Defendants overbilled and/or did not perform, as alleged herein, were inherent costs for protection and security of PII/PHI. Upon information and belief, these activities generated at least $98.15 million in revenues for the Enterprise. Further, upon information and belief, Defendants routinely admitted patients for inpatient treatment of certain procedures, such as cardiac and hemodialysis procedures, that should have been done on an outpatient basis in order to collect the higher inpatient fees. Upon information and belief, CHS, CHSPSC, the Hospital Defendants, and The Clinic Defendants used the used the United States

mail, a private courier, or interstate or international wires to, on at least two or more occasions, to deliver bills, statements, and invoices seek monies for false claims and overbilling to current and former patients (including Plaintiffs and class members) and (or in the alternative) their indemnitors such as, but not limited to, Medicaid, Medicare, Tri-Care, and government employee health plans. Upon information and belief, numerous others will be identified in the process of discovery.

n. Under the American Recovery and Reinvestment Act of 2009, the federal government makes incentive payments to hospitals and medical professionals who attest that they comply with federal regulations to protect, secure, keep private, and not disclose PII/PHI. The Medicare and Medicaid EHR Incentive Programs provide financial incentives for the meaningful use of certified EHR technology to improve patient care. To receive an EHR incentive payment, providers have to show that they are meaningfully using their EHRs by meeting thresholds for a number of objectives. The EHR Incentive Programs are phased in three stages with increasing requirements. Eligible professionals participate in the program on the calendar year, while eligible hospitals and CAHs participate according to the federal fiscal year. Providers must attest to demonstrating meaningful use every year to receive an incentive and avoid a Medicare payment

adjustment. To receive the payment from CMS, a company must file an attestation electronically through the CMS website.

Meaningful use requirements mandate that a hospital protect electronic health information created or maintained by the certified EHR technology through the implementation of appropriate technical capabilities. To receive payment, eligible hospitals and CAHs must attest YES to having conducted or reviewed a security risk analysis in accordance with the requirements under 45 CFR 164.308(a)(1) and implemented security updates as necessary and corrected identified security deficiencies prior to or during the EHR reporting period to meet this measure. Likewise, Eligible professionals (EPs) must attest YES to having conducted or reviewed a security risk analysis in accordance with the requirements under 45 CFR 164.308(a)(1) and implemented security updates as necessary and corrected identified security deficiencies prior to or during the EHR reporting period to meet this measure. To receive the Stage 2 incentive payment, a hospital must attest that it conducted or reviewed a security risk analysis in accordance with the requirements under 45 CFR 164.308(a)(1), including addressing the encryption/security of data stored in CEHRT in accordance with requirements under 45 CFR 164.312 (a)(2)(iv) and 45 CFR 164.306(d)(3), and implemented security updates as necessary and correct identified security deficiencies as part of the provider's risk management process for eligible hospitals.

Meaningful use incentive payments are lucrative for the Enterprise and necessary to generate income to continue the Enterprise's racketeering activities. In CHS's 2013 Form 10-K, it stated: "The Company recognized approximately $165.9 million, $126.7 million and $63.4 million during the years ended December 31, 2013, 2012 and 2011, respectively, of incentive reimbursement for HITECH incentives from Medicare and Medicaid related to certain of the Company's hospitals and for certain of the Company's employed physicians that have demonstrated meaningful use of certified EHR technology or have completed attestations to their adoption or implementation of certified EHR technology. These incentive reimbursements are presented as a reduction of operating costs and expenses on the consolidated statements of income. The Company received cash related to the incentive reimbursement for HITECH incentives of approximately $203.1 million, $141.0 million and $37.4 million during the years ended December 31, 2013, 2012 and 2011, respectively. As of December 31, 2013 and 2012, $90.2 million and $33.3 million, respectively, were recorded as deferred revenue as all criteria for gain recognition had not been met." Filing false meaningful use attestations have also been lucrative for the Enterprise. For example, during CHS's merger with Health Management Associates (hereinafter "HMA"), HMA wrongfully claimed $31 million in meaningful use incentive payments arising out of attestations filed for eleven hospitals that did not meet

CMS requirements for the payments. Upon information and belief, these wrongful payments totaled $8.3 million in 2011, approximately $17.3 million in 2012 and approximately $5.4 million in the first six months of 2013. Upon information and belief, more attestations will be proven false during discovery in this action.

Upon information and belief, between 2011 and 2013, CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants individually and separately used the used the United States mail, a private courier, or interstate or international wires, in furtherance of the scheme to defraud Plaintiffs and Class members, to file attestations with DHHS and CMS.[9] The statements therein were false and designed to defraud DHHS and CMS to obtain the meaningful use financial incentive payment. The meaningful use fraud is merely one facet of the overall racketeering activities of the CHS Enterprise in furtherance of the scheme to defraud Plaintiffs and class members of payment in exchange for false promises to protect, secure, keep private, and not disclose PII/PHI. These many acts of mail and/or wire fraud to achieve meaningful use incentive payments generated significant income for the CHS Enterprise that has proximately caused Plaintiffs' harm, injury, and damages.

---

[9] Exact dates for each individual defendant will be identified during discovery. Plaintiffs and class members, upon information and belief, intend for this paragraph to detail at least 206 instances of mail/wire fraud.

## The Pattern of Racketeering Activity

339.    CHS, CHSPSC, The  Hospital  Defendants,  and  The  Clinic

Defendants' previously alleged RICO predicate acts in furtherance of its scheme to

defraud constituted a pattern of racketeering activity within the meaning of 18

U.S.C. § 1961(5) because the predicate acts are related and continuous.  Each

predicate act had the same or similar purpose: the predicate acts involved material

misrepresentations,  omissions,  and/or  concealment  in  a  scheme  to  defraud

Plaintiffs and class members out of their money and into believing that Defendants'

would protect, secure, keep private, and not disclose to third-parties their PII/PHI

and to pay a premium for such services. Included in these predicate acts are those

instances  where  CHS,  CHSPSC,  The  Clinic  Defendants,  and/or  The  Hospital

Defendants used or caused to be used the United States mail, a private courier, or

interstate  or  international  wires  to  deliver  documents  to  Plaintiffs  and  class

members,  their  indemnitors,  and  the  federal  government.  This  pattern  of

racketeering is separate from and distinct from the legitimate business operations

of the Enterprise alleged herein.

340.   CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants

are  associated  with  the  Enterprise  and  received  income  derived,  directly  or

indirectly, from a pattern of racketeering activity and used or invested, directly or

indirectly, any part of such income, or the proceeds of such income, in acquisition

of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate, or foreign commerce. Defendants did so through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1961(5) and 1962(c), to wit: multiple instances of mail fraud in violation of 18 U.S.C. § 1341 and multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

341.   Plaintiffs have sufficiently alleged these predicate acts and pattern of racketeering to state a claim under 18 U.S.C. § 1962. As a proximate result of the pattern of racketeering activity and RICO violations engaged in by CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants, Plaintiffs and the class members have suffered injury, damages, and harm.

**Relatedness and Continuity of the Racketeering Activity**

342.   All of the predicate acts alleged above are related to the scheme of CHS, CHSPSC, The Hospital Defendants and The Clinic Defendants–that is, defrauding and lulling Plaintiffs and class members. The acts are all related to CHS, CHSPSC, The Hospital Defendants, and the Clinic Defendants' promise to protect, secure, keep private, and not disclose to third-parties PII/PHI. Continuity is demonstrated by the predicate acts alleged above because the pattern of racketeering involves multiple predicate acts and related predicate acts that have taken place over many year. Further, these false statements remain and have

remained on the Enterprise's websites for many years and similar statements appeared prior. These predicate acts in furtherance of its scheme illustrate a threat of continued racketeering activity and evidence that the predicate acts constitute the regular way that CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants conduct business.

343.   As a proximate result of the pattern of racketeering activity and RICO violations engaged in by CHS, CHSPSC, The Clinic Defendants, and The Hospital Defendants, Plaintiffs and the Class members have suffered injury, harm, and damages including but not limited to emotional distress, loss of monies paid to Defendants for services to protect and not disclose PII/PHI, and Plaintiffs and class members have and will have to spend significant time and money to protect themselves; including, but not limited to: the cost of responding to the data breach, cost of conducting a damage assessment, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, cost for credit monitoring, costs for insurance to indemnify against misuse of identity, costs to rehabilitate Plaintiffs and class members' PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally, for compensatory and/or punitive damages (including statutory treble damages), the sum to be determined by a jury, which will fairly and adequately

compensate Plaintiffs for the above described damages and injuries, together with interest from the date of the incident and the costs of the proceeding, including attorney's fees.

## COUNT TWO

## <u>VIOLATION OF 18 U.S.C. § 1962(b)</u>

344.    Plaintiffs adopt and re-allege all paragraphs set forth hereinabove as is fully set out herein.

345.    Plaintiffs and class members bring this count pursuant to 18 U.S.C. § 1964.

346.    The Racketeering Influenced and Corrupt Organizations Act (hereinafter "RICO") provides:

> It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. 18 U.S.C. § 1962(b).

347.    CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants engaged in a pattern of racketeering activity more fully described previously herein.

348.    Through the pattern of racketeering activity, CHS, CHSPSC, The Clinic Defendants, and/or The Hospital Defendants or, in the alternative, a

combination thereof acquired or maintained, directly or indirectly, an interest in or control of the Enterprise.

349.   Specifically, CHS and CHSPSC's racketeering activities allow them to maintain control over the Enterprise and acquire new hospitals and clinics for use in the Enterprise. For example, CHS does not own every hospital; it leases some. CHS described their acquisition strategy in the 2013 Form 10-K:

> Our strategy has also included growth by acquisition. We generally target hospitals in growing, non-urban and selected urban healthcare markets for acquisition because of their favorable demographic and economic trends and competitive conditions. Because non-urban and suburban service areas have smaller populations, there are generally fewer hospitals and other healthcare service providers in these communities and generally a lower level of managed care presence in these markets. We believe that smaller populations support less direct competition for hospital-based services and these communities generally view the local hospital as an integral part of the community. We believe opportunities exist for skilled, disciplined operators in selected urban markets to create networks between urban hospitals and non-urban hospitals while improving physician alignment in those markets and making it more attractive to managed care. In recent years, our acquisition strategy has also included acquiring selective physician practices and physician-owned ancillary service providers. Such acquisitions are executed in markets where we already have a hospital presence and provide an opportunity to increase the number of affiliated physicians or expand the range of specialized healthcare services provided by our hospitals.

CHS's racketeering activities provides it significant financial resources to enact this ambitious and expensive acquisition strategy. As expressly stated in its 2013 Form 10-K, CHS acquires opportunities only in markets with "favorable . . . competitive conditions" (i.e., no competitors) and a "lower

level of managed care." CHS also states in its 2013 Form 10-K that HIPAA and DHHS "privacy regulations and security regulations have and will continue to impose significant costs on our facilities in order to comply with these standards." That is, actually protecting PII/PHI is a "significant cost" that is an impermeable barrier to entry for new market participants and a fatal cost to hospitals and clinics that make or genuinely intend to make the financial investment to actually comply with privacy regulations and security regulations. CHS's racketeering activities, that is generating income money by making false promises to protect and not disclose PII/PHI, allows it the financial ability to takeover hospital facilities because it does not actually comply with its promises and privacy and security regulations. CHS's failure to comply (that is, collecting monies upon promises to protect, secure, keep private, and not disclose PII/PHI and not investing that money into protection and security and controls and policies to prevent disclosure to third-parties) also allows them to maintain control of the Enterprise and squeeze out and prevent market competitors (who presumably bear the cost of HIPAA and DHHS compliance) through anticompetitive behavior and a pricing advantage. This allows Defendants to promise to provide services at an anticompetitive price and also acquire ownership in new ventures that are impressed into the Enterprise.

350.   Further, one purpose of CHSPSC is to provide management, consulting, and technology service to the Hospital Defendants and Clinic Defendants. CHSPSC, therefore, is the muscle that allows Defendants to maintain control over the Enterprise and make acquisitions through its management and consulting services. Through these services, acquisitions are assimilated into the CHS Enterprise. CHSPSC perpetuates the racketeering activities by not protecting, securing,  keeping private and actually disclosing PII/PHI.

351.   The Hospital Defendants and Clinic Defendants play an active role in the maintenance and acquisition described herein because they generate income, make false promises, and execute the anticompetitive behavior that is necessary to maintain the Enterprise and force market competitors into an acquisition.

352.   The Enterprise, through its operations more fully described previously herein, engaged in, or had some effect on, interstate or foreign commerce.

353.   As a proximate result of the pattern of racketeering activity and RICO violations engaged in by CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants, Plaintiffs and the Class members have suffered injury, harm, and damages including but not limited to emotional distress, loss of monies paid to Defendants for services to protect and not disclose PII/PHI, and Plaintiffs and class members have and will have to spend significant time and money to protect themselves; including, but not limited to: the cost of responding to the data breach,

cost of conducting a damage assessment, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, cost for credit monitoring, costs for insurance to indemnify against misuse of identity, costs to rehabilitate Plaintiffs and class members' PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally, for compensatory and/or punitive damages (including statutory treble damages), the sum to be determined by a jury, which will fairly and adequately compensate Plaintiffs for the above described damages and injuries, together with interest from the date of the incident and the costs of the proceeding, including attorney's fees.

## COUNT THREE

## VIOLATION OF 18 U.S.C. § 1962(c)

354.   Plaintiffs adopt and re-allege all paragraphs set forth hereinabove as is fully set out herein.

355.   Plaintiffs and class members bring this count pursuant to 18 U.S.C. § 1964.

356.   The Racketeering Influenced and Corrupt Organizations Act (hereinafter "RICO") provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate

or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. 18 U.S.C. § 1962(c)

357.   As described more fully previously herein, an Enterprise existed.

358.   As described more fully previously herein, the Enterprise engaged in, or had some effect on, interstate or foreign commerce.

359.   CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants or, in the alternative, a various combination thereof were associated with the Enterprise.

360.   CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants or, in the alternative, a various combination thereof participated, either directly or indirectly, in the conduct of the affairs of the enterprise.

361.   As described more fully previously herein, CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants or, in the alternative, a various combination thereof participated in the Enterprise through a pattern of racketeering activity.

362.   As a proximate result of the pattern of racketeering activity and RICO violations engaged in by CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants or, in the alternative, a combination thereof, Plaintiffs and the Class members have suffered injury, harm, and damages including but not limited to emotional distress, loss of monies paid to Defendants for services to protect and

not disclose PII/PHI, and Plaintiffs and class members have and will have to spend significant time and money to protect themselves; including, but not limited to: the cost of responding to the data breach, cost of conducting a damage assessment, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, cost for credit monitoring, costs for insurance to indemnify against misuse of identity, costs to rehabilitate Plaintiffs and class members' PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally, for compensatory and/or punitive damages (including statutory treble damages), the sum to be determined by a jury, which will fairly and adequately compensate Plaintiffs for the above described damages and injuries, together with interest from the date of the incident and the costs of the proceeding, including attorney's fees.

**COUNT FOUR**

**<u>VIOLATION OF 18 U.S.C. § 1962(d)</u>**

363.    Plaintiffs adopt and re-allege all paragraphs set forth hereinabove as is fully set out herein.

364.   Plaintiffs and class members bring this count pursuant to 18 U.S.C. § 1964.

365. The Racketeering Influenced and Corrupt Organizations Act (hereinafter "RICO") provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

366. CHS, CHSPSC, The Hospital Defendants, and The Clinic Defendants or, in the alternative, a various combination thereof of at least two agreed to try to accomplish an unlawful plan to engage in a pattern of racketeering activity as described more fully previously herein.

367. At least one of the defendants (CHS, CHSPSC, one of The Hospital Defendants, or one of The Clinic Defendants) agreed to the overall objective of the conspiracy or, in the alternative, one of the defendants agreed with at least one other defendant to commit two predicate acts described more fully previously herein as part of the conspiracy.

368. As a proximate result of this conspiracy, Plaintiffs and the Plaintiff Class members have suffered injury, harm, and damages including but not limited to emotional distress, loss of monies paid to Defendants for services to protect and not disclose PII/PHI, and Plaintiffs and class members have and will have to spend significant time and money to protect themselves; including, but not limited to: the cost of responding to the data breach, cost of conducting a damage assessment, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports,

cost for credit monitoring, costs for insurance to indemnify against misuse of identity, costs to rehabilitate Plaintiffs and class members' PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally, for compensatory and/or punitive damages (including statutory treble damages), the sum to be determined by a jury, which will fairly and adequately compensate Plaintiffs for the above described damages and injuries, together with interest from the date of the incident and the costs of the proceeding, including attorney's fees.

## COUNT FIVE

## VIOLATION OF 18 U.S.C. § 1030

369.    Plaintiffs adopt and re-allege all paragraphs set forth hereinabove as is fully set out herein.

370.   The Computer Fraud and Abuse Act provides, in pertinent part, liability for "[w]hoever knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer; intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or intentionally accesses a protected computer

without authorization, and as a result of such conduct, causes damage and loss." 18 U.S.C. § 1030(a)(5)(A)-(C).

371.   CHS, CHSPSC, one of The Hospital Defendants and/or one of The Clinic Defendants, or an employee of CHS, CHSPSC, or one of The Hospital Defendants or one of The Clinic Defendants (for which CHS, CHSPSC, or one of The Hospital Defendants or one of The Clinic Defendants would be liable under a theory of *respondeat superior*) knowingly transmitted a program, information, code, or command to a protected computer without authorization and caused damage.

372.   As one example, the failure of a hospital, clinic, or multi-state corporation such as Defendants to patch or install software upgrades for a malware as notorious as Heartbleed is so inexcusable that the only plausible explanation is that the failure to take adequate precautions was intentional and/or knowingly. As a result of this failure, Defendants' computer systems were accessed not once, but twice. Given that the transmission was from one computer for which the entity or employee was authorized to use and transmitted to another (or more) computer(s) that the entity or employee was not authorized to use, Heartbleed was knowingly transmitted to a protected computer without authorization and caused damage. As one further example, the method in which Heartbleed was acquired—which will be

flushed out in discovery—was through accessing or downloading electronic information that exceeded the employee's permissible and/or authorized use.

373.   In the alternative, CHS, CHSPSC, one of The Hospital Defendants or one of The Clinic Defendants, or an employee of CHS, CHSPSC, or one of The Hospital Defendants or one of The Clinic Defendants (for which CHS, CHSPSC, or one of The Hospital Defendants or one of The Clinic Defendants would be liable under a theory of *respondeat superior*) intentionally accessed a protected computer without authorization and recklessly caused damage.

374.   In the alternative, CHS, CHSPSC, one of The Hospital Defendants or the one of Clinic Defendants, or an employee of CHS, CHSPSC, or one of The Hospital Defendants or one of The Clinic Defendants (for which CHS, CHSPSC, or one of The Hospital Defendants or one of The Clinic Defendants would be liable under a theory of *respondeat superior*) intentionally accessed a protected computer without authorization, and as a result of such conduct, caused damage and loss.

375.   The computer was used in or affected interstate or foreign commerce or communication.

376.   The damage resulted in losses of more than $5,000 during a one-year period; the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of one or more individuals;

physical injury; a threat to public health or safety; and/or damage affecting ten or more protected computers during any one-year period.

377.  As a proximate result, Plaintiffs and class members have suffered a loss, within the meaning of 18 U.S.C. § 1030, because they have incurred reasonable costs as victims, including the cost of responding to the offense(s), conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense.

378.  As a proximate result, Plaintiffs and the Plaintiff Class members have suffered injury, harm, and damages including but not limited to emotional distress, loss of monies paid to Defendants for services to protect and not disclose PII/PHI, and Plaintiffs and class members have and will have to spend significant time and money to protect themselves; including, but not limited to: the cost of responding to the data breach, cost of conducting a damage assessment, mitigation costs, costs to obtain credit reports, costs to obtain future credit reports, cost for credit monitoring, costs for insurance to indemnify against misuse of identity, costs to rehabilitate Plaintiffs and class members' PII/PHI, and costs to reimburse from losses incurred as a proximate result of the breach.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally, for compensatory and/or punitive damages, the sum to be determined by a jury, which will fairly and adequately compensate Plaintiffs for the above

described damages and injuries, together with interest from the date of the incident and the costs of the proceeding, including attorney's fees.

## COUNT SIX

## UNJUST ENRICHMENT

379.   Plaintiffs adopt and re-allege all paragraphs set forth hereinabove as is fully set out herein.

380.   Defendants received payment from Plaintiffs to perform services that included protecting, securing, keeping private, and not disclosing Plaintiffs' PII/PHI.

381.   Defendants did not protect, secure, and/or keep private Plaintiffs' PII/PHI and/or disclosed Plaintiffs' PII/PHI, but retained Plaintiffs' payments.

382.   Defendants have knowledge of said benefit.

383.   Defendants have been unjustly enriched and it would be inequitable for Defendants to retain Plaintiffs' payments.

384.   As a result, Plaintiffs have been proximately harmed and/or injured.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally, for compensatory and/or punitive damages, the sum to be determined by a jury, which will fairly and adequately compensate Plaintiffs for the above described damages and injuries, together with interest from the date of the incident and the costs of the proceeding, including attorney's fees.

## COUNT SEVEN

## <u>MONEY HAD AND RECEIVED</u>

385.     Plaintiffs adopt and re-allege all paragraphs set forth hereinabove as is fully set out herein.

386.     Defendants have received payment from Plaintiffs to perform services that included protecting and not disclosing Plaintiffs' PII/PHI.

387.     Defendants did not protect Plaintiffs' PII/PHI and/or disclosed Plaintiffs' PII/PHI, but retained Plaintiffs' payments.

388.     The law creates an implied promise by Defendants to pay it to Plaintiffs.

389.     Defendants have breached said implied promise.

390.     Defendants' breach has proximately caused Plaintiffs to suffer harm, injury, and damages.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally, for compensatory and/or punitive damages, the sum to be determined by a jury, which will fairly and adequately compensate Plaintiffs for the above described damages and injuries, together with interest from the date of the incident and the costs of the proceeding, including attorney's fees.

## COUNT EIGHT

## BREACH OF CONTRACT (express and/or implied)

391.   Plaintiffs adopt and re-allege all paragraphs set forth hereinabove as is fully set out herein.

392.   Plaintiffs paid money to Defendants in exchange for services, which included promises to secure, safeguard, protect, keep private, and not disclose Plaintiffs' PII/PHI.

393.   In documents that memorialize the obligations of the parties, Defendants promised Plaintiffs and class members that they would protect, secure, keep private, and not disclose their PII/PHI.

394.   These documents were provided in a manner and during a time where they became part of the agreement for services.

395.   Defendants promised to comply with all HIPAA standards and to make sure that Plaintiffs' PII/PHI was protected, secured, kept private, and not disclosed.

396.   In the alternative, to the extent it was not expressed or, again in the alternative, an implied contract existed in the absence of an express contract whereby, Defendants promised to comply with all HIPAA and DHHS standards and regulations and to ensure that Plaintiffs' PII/PHI was secured, safeguarded, kept private, protected, and not disclosed to third parties.

397.   To the extent that it was not expressed, an implied contract was created whereby Defendants' promised to safeguard Plaintiffs' health information and PII/PHI from being accessed, copied, and transferred by or disclosed to third parties.

398.   In the alternative, an express contract did not exist, but an implied contract existed between the parties whereby, in exchange from monies from Plaintiffs and class members, Defendants agreed to protect, safeguard, secure, keep private, and not disclose to third-parties Plaintiffs and class members' PII/PHI.

399.   Under the implied contract, Defendants were further obligated to provide Plaintiffs with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII/PHI.

400.   Defendants did not secure, safeguard, protect, and/or keep private Plaintiffs' PII/PHI and/or disclosed Plaintiff's PII/PHI to third parties and, therefore, breached its contract with Plaintiffs.

401.   Defendants allowed third parties to access, copy, and transfer Plaintiffs' health information and PII/PHI and, therefore, breached its contract with Plaintiffs.

402.   Furthermore, Defendants' failure to satisfy their confidentiality and privacy obligations resulted in Defendants providing services to Plaintiffs that were of a diminished value.

403.    As a result, Plaintiffs have been harmed, damaged, and/or injured.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally, for compensatory and/or punitive damages, the sum to be determined by a jury, which will fairly and adequately compensate Plaintiffs for the above described damages and injuries, together with interest from the date of the incident and the costs of the proceeding, including attorney's fees.

## COUNT NINE

## NEGLIGENCE

404.    Plaintiffs adopt and re-allege all paragraphs set forth hereinabove as is fully set out herein.

405.    Defendants requested and came into possession of Plaintiffs' PII/PHI and had a duty to exercise reasonable care in securing, safeguarding, keeping private, and protecting such information from being accessed by and disclosed to third parties. Defendants' duty arose from the industry standards discussed above and its relationship with Plaintiffs.

406.    Defendants had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiffs' PII/PHI. The breach of security, unauthorized access, transfer of data, and resulting injury to Plaintiffs' and the Class were reasonably foreseeable, particularly in light of Defendants' inadequate data security system, failure to adequately encrypt the data, failure to

install software updates and patches, disregard of warnings by employees, and failure to respond to notorious malware.

407. Defendants had duties clearly defined by HIPAA and DHHS and defendants breached those duties.

408. Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiffs by failing to implement standard industry protocols and/or exercise reasonable care in protecting, securing, keeping private, safeguarding, and not disclosing Plaintiffs' PII/PHI.

409. Defendants, through their actions and/or omissions, breached their duty to Plaintiffs by failing to have procedures in place to detect and prevent access to Plaintiffs' PII/PHI by unauthorized persons.

410. But for Defendants' breach of its duties, Plaintiffs' PII/PHI would not have been access, copied, transferred, and/or disclosed.

411. Plaintiffs' PII/PHI was stolen and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding, securing, protecting, and keeping private such information by adopting, implementing, and maintaining appropriate security measures and encryption.

412. As a result, Plaintiffs have been harmed, damaged, and/or injured.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally, for compensatory and/or punitive damages, the sum to be determined by

a jury, which will fairly and adequately compensate Plaintiffs for the above described damages and injuries, together with interest from the date of the incident and the costs of the proceeding, including attorney's fees.

## COUNT TEN

## **WANTONNESS**

413.    Plaintiffs adopt and re-allege all paragraphs set forth hereinabove as is fully set out herein.

414.    Defendants knew, were substantially aware, should have known, or acted in reckless disregard that Plaintiffs would be harmed if Defendants did not safeguard, secure, protect, keep private, and not disclose Plaintiffs' PII/PHI.

415.    Defendants did not safeguard, secure, keep private, and/or protect and disclosed to third-parties Plaintiffs' and class members PII/PHI with a knowledge or consciousness that the action or failure to act will likely or probably cause harm or, in the alternative, with reckless indifference to the consequences.

416.    As a result, Plaintiffs have been harmed, damaged, and/or injured.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally, for compensatory and/or punitive damages, the sum to be determined by a jury, which will fairly and adequately compensate Plaintiffs for the above described damages and injuries, together with interest from the date of the incident and the costs of the proceeding, including attorney's fees.

## COUNT ELEVEN

## <u>NEGLIGENCE PER SE</u>

417.   Plaintiffs adopt and re-allege all paragraphs set forth hereinabove as is fully set out herein.

418.   Defendants have violated HIPAA by:

a. Failing to ensure the confidentiality and integrity of electronic protected health information it created, receives, maintains, and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

c. Failing to implement technical policies and procedures that govern the receipt and removal of hardware and electronic media that contain electronic protected health information into and out of a facility to maintain their security in violation of 45 C.F.R. § 164.310(d)(1);

d. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R.  § 164.308(a)(1);

e. Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

f. Failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. § 164.306(a)(2);

g. Failing to protect against an reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

h. Failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(94);

i. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502 et seq.;

j. Failing to effectively train all members of its workforce (including independent contractors involved in the data breach) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of

protected health information in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

k. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. § 164.530(c).

419. Defendants' violation of HIPAA resulted in an injury to Plaintiffs.

420. Plaintiffs fall within the class of persons HIPAA was intended to protect.

421. The harms Defendants caused to Plaintiffs are injuries that result from the type of behavior that HIPAA was intended to protect.

422. As a result, Plaintiffs have been harmed, damaged, and/or injured.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally, for compensatory and/or punitive damages, the sum to be determined by a jury, which will fairly and adequately compensate Plaintiffs for the above described damages and injuries, together with interest from the date of the incident and the costs of the proceeding, including attorney's fees.

## COUNT TWELVE

## **BREACH OF COVENANT OF GOOD FAITH & FAIR DEALING**

423. Plaintiffs adopt and re-allege all paragraphs set forth hereinabove as is fully set out herein.

424.   Every contract contains a covenant of good faith and fair dealing that prohibits a contracting party from intentionally depriving the other contracting party of the fruits of the contract (the "Covenant").

425.   Through the conduct stated in this Complaint, Defendants have breached the Covenant.

426.   Defendants' acts and omissions deprived Plaintiffs from receiving the fruits of the agreement.

427.   Defendants' breach of the Covenant completely and proximately caused Plaintiffs to suffer harm and damages.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally, for compensatory and/or punitive damages, the sum to be determined by a jury, which will fairly and adequately compensate Plaintiffs for the above described damages and injuries, together with interest from the date of the incident and the costs of the proceeding, including attorney's fees.

## COUNT THIRTEEN

## WILLFUL VIOLATION OF THE FAIR CREDIT REPORTING ACT

428.   Plaintiffs adopt and re-allege all paragraphs set forth hereinabove as is fully set out herein.

429.   The Fair Credit Reporting Act ("FCRA") requires consumer reporting agencies to adopt and maintain procedures for meeting the needs of commerce for

consumer credit, personnel, insurance and other information in a manner fair and equitable to consumers while maintaining the confidentiality, accuracy, relevancy and proper utilization of such information. 15 U.S.C. § 1681(b).

430.   FCRA specifically protects medical information, restricting its dissemination to limited instances. See, e.g., 15 U.S.C. §§ 1681a(d)(3); 1681b(g); 1681c(a)(6).

431.   Defendants are a Consumer Reporting Agency as defined under FCRA because on a cooperative nonprofit basis and/or for monetary fees, Defendants regularly engage, in whole or in part, in the practice of assembling information on consumers for the purpose of furnishing Consumer Reports to third parties and/or uses interstate commerce for the purpose of preparing and/or furnishing Consumer Reports.

432.   By collecting, gathering and storing information bearing on consumers' credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living, Defendants create "consumer reports" on their patients, which they transmit to medical service providers affiliated with Defendants to use for the purpose of establishing patient's eligibility for credit for medical treatments and services, rendering each Defendant a "consumer reporting agency" under the FCRA.

433.   As a Consumer Reporting Agency, Defendants were (and continue to be) required to adopt and maintain procedures designed to protect and limit the dissemination of consumer credit, personnel, insurance and other information (such as Plaintiffs' and Class Members' PII/PHI) in a manner fair and equitable to consumers while maintaining the confidentiality, accuracy, relevancy, and proper utilization of such information. Defendants, however, violated FCRA by failing to adopt and maintain such protective procedures which, in turn, directly and/or proximately resulted in the theft of Plaintiffs' PII/PHI and its wrongful dissemination into the public domain.

434. Plaintiffs' PII/PHI, in whole or in part, constitutes medical information as defined by FCRA. Defendants violated FCRA by failing to specifically protect and limit the dissemination of Plaintiffs' PII/PHI into the public domain.

435.   As a direct and/or proximate result of Defendants' willful and/or reckless violations of FCRA, as described above, Plaintiffs' PII/PHI was stolen and/or made accessible to unauthorized third parties in the public domain.

436.   As a direct and/or proximate result of Defendants' willful and/or reckless violations of FCRA, as described above, Plaintiffs were (and continue to be) damaged in the form of, without limitation, expenses for credit monitoring and identity theft insurance, mitigation costs, cost of conducting a damage assessment,

out-of-pocket expenses, anxiety, emotional distress, loss of privacy, and other economic and non-economic harm.

437.   Plaintiffs and Class Members, therefore, are entitled to compensation for their actual damages including, inter alia, (i) out-of-pocket expenses incurred to assess and mitigate the actual and increased risk of identity theft and/or identity fraud pressed upon them by the Data Breach; (ii) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (iii) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (iv) anxiety and emotional distress; and (v) statutory damages of not less than $100, and not more than $1000, each, as well as attorneys' fees, litigation expenses and costs, pursuant to 15 U.S.C. §1681n(a).

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally, for compensatory and/or punitive damages, the sum to be determined by a jury, which will fairly and adequately compensate Plaintiffs for the above described damages and injuries, together with interest from the date of the incident and the costs of the proceeding, including attorney's fees.

## COUNT FOURTEEN

## <u>NEGLIGENT VIOLATION OF THE FAIR CREDIT REPORTING ACT</u>

438.   Plaintiffs adopt and re-allege all paragraphs set forth hereinabove as is fully set out herein.

439.   In the alternative, and as described above, Defendants negligently violated FCRA by failing to adopt and maintain procedures designed to protect and limit the dissemination of Plaintiffs' PII/PHI for the permissible purposes outlined by FCRA which, in turn, directly and/or proximately resulted in the theft and dissemination of Plaintiffs' PII/PHI into the public domain.

440.   It was reasonably foreseeable that Defendants' failure to implement and maintain procedures to protect, keep private, and secure Plaintiffs' PII/PHI would result in an unauthorized third party gaining access to Plaintiffs' PII/PHI for no permissible purpose under FCRA.

441.   As a direct and/or proximate result of Defendants' negligent violations of FCRA, as described above, Plaintiffs' PII/PHI was stolen and/or made accessible to unauthorized third parties in the public domain.

442.   As a direct and/or proximate result of Defendants' negligent violations of FCRA, as described above, Plaintiffs were (and continue to be) damaged in the form of, without limitation, expenses for credit monitoring and identity theft insurance, mitigation costs, cost of a damage assessment, out-of-pocket expenses,

127

anxiety, emotional distress, loss of privacy and other economic and non-economic harm.

443.   Plaintiffs and Class Members, therefore, are entitled to compensation for their actual damages including, inter alia, (i) out-of-pocket expenses incurred to assess and mitigate the actual and increased risk of identity theft and/or identity fraud pressed upon them by the Data Breach; (ii) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (iii) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (iv) anxiety and emotional distress; and (v) statutory damages of not less than $100, and not more than $1000, each, as well as attorneys' fees, litigation expenses and costs, pursuant to 15 U.S.C. §1681o.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally, for compensatory and/or punitive damages, the sum to be determined by a jury, which will fairly and adequately compensate Plaintiffs for the above described damages and injuries, together with interest from the date of the incident and the costs of the proceeding, including attorney's fees.

## COUNT FIFTEEN

## <u>INVASION OF PRIVACY</u>

444.   Plaintiffs adopt and re-allege all paragraphs set forth hereinabove as is fully set out herein.

445.   Defendants' misconduct, as described herein, and failure to encrypt, protect, secure, keep private, or otherwise keep Plaintiffs' PII/PHI confidential constituted an invasion of Plaintiffs' privacy.

446.   Said PII/PHI is not a matter of public concern.

447.   Defendants' failures, acts, omissions, and/or misconduct resulted in an unreasonable intrusion into the private life and matters of Plaintiffs and class members.

448.   Defendants' failures, acts, omissions, and/or misconduct constituted a public disclosure of private facts, the nature of which a reasonable person of ordinary sensibilities would find objectionable and offensive.

449.   As a direct result of Defendants' failures and misconduct, Plaintiffs' PII/PHI was disclosed to the public.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally, for compensatory and/or punitive damages, the sum to be determined by a jury, which will fairly and adequately compensate Plaintiffs for the above

described damages and injuries, together with interest from the date of the incident and the costs of the proceeding, including attorney's fees.

## COUNT SIXTEEN

## Conspiracy

450.   Plaintiffs adopt and re-allege all paragraphs set forth hereinabove as is fully set out herein.

451.   As set forth supra, Defendants acted in concert or materially aided each other and others in a conspiracy to accomplish all of the acts set forth in every count by unlawful, oppressive, or immoral means.

452.   Defendants acted in concert or materially aided each other and others in committing an overt act in furtherance of the conspiracy.

453.   The CHS Enterprise had substantial operations in Alabama and the defendants operating and conducting business in Alabama played a critical role in the conspiracy. Each out-of-state defendant agreed to and/or performed the same wrongful acts alleged herein. Further, by such agreement and wrongful acts, each defendant generated income that, directly or directly, funded the wrongful acts that took place in Alabama.

454.   Such overt acts are sufficient for the Court to exercise *in personam* conspiracy jurisdiction over every defendant under Alabama law.

455.   As a proximate result, Plaintiffs and class members have been harmed, damaged, and injured.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally, for compensatory and/or punitive damages, the sum to be determined by a jury, which will fairly and adequately compensate Plaintiffs for the above described damages and injuries, together with interest from the date of the incident and the costs of the proceeding, including attorney's fees.

## COUNT SEVENTEEN

## **VICARIOUS LIABILITY**

456.   Plaintiffs adopt and re-allege all paragraphs set forth hereinabove as is fully set out herein.

457.   Defendants served as the employer and/or master of their employees, staff, or medical professionals.

458.   Defendants have vicarious liability for the acts and omissions of all persons or entities under Defendants' control either directly or indirectly, including their employees, agents, consultants, medical directors, and independent contractors, whether in-house or outside entities, individuals, agencies or pools causing or contributing to the injuries, damage, and harm to Plaintiffs  and Class Members.

459. Further, Defendants' employees, staff, agents, or medical professionals were in the line and scope of employment when they performed of failed to perform acts and/or omissions alleged herein.

460. Additionally, the acts and/or omissions of Defendants' employees, staff, agents, or medical professionals performed or failed to perform were ratified by Defendants.

461. Defendants are vicariously liable for the acts of their employees, staff, agents, or medical professionals.

462. Such conduct was the proximate cause of Plaintiffs and Class Members' injuries, damage, and harm.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally, for compensatory and/or punitive damages, the sum to be determined by a jury, which will fairly and adequately compensate Plaintiffs for the above described damages and injuries, together with interest from the date of the incident and the costs of the proceeding, including attorney's fees.

## **RELIEF REQUESTED**

463. Certify this case as a class action on behalf of the Plaintiff Class and, if necessary, Subclasses as defined above, and appoint named Plaintiffs as class representatives and undersigned counsel as lead counsel;

464.   Certify this case as a class action against the Hospital Defendant Class as defined above;

465.   Certify this case as a class action against the Clinic Defendant Class as defined above;

466.   Find that Defendants are liable under all legal claims asserted herein for their failure to safeguard, secure, protect, keep private, and not disclose Plaintiffs and Class members' PII/PHI;

467.   Award injunctive and other equitable relief as is necessary to protect the interests of the Classes, including: (i) an order prohibiting Defendants from engaging in the wrongful and unlawful acts described herein, and (ii) requiring Defendants to protect all data collected through the course of its business in accordance with HIPAA, DHHS, and industry standards, (iii) lifetime consumer credit protection and monitoring services for Plaintiffs; and (iv) lifetime consumer credit insurance to provide coverage for unauthorized use of Plaintiffs' personal information, medical information, and financial information;

468.   Award damages, including statutory damages where applicable and punitive damages, to Plaintiffs and the Classes in an amount to be determined at trial;

469.   Award restitution for any identity theft and misuse of identity, including, but not limited to payment of any other costs, including attorneys' fees

incurred by the victim in clearing the victim's credit history or credit rating, or any costs incurred in connection with any civil or administrative proceeding to satisfy any debt, lien, or other obligation of the victim arising as the result of Defendants' actions;

470.   Award restitution in an amount to be determined by an accounting of the difference between the price Plaintiffs and the Classes paid in reliance upon Defendants' duty/promise to secure its members' PII/PHI, and the actual services— devoid of proper protection mechanisms—rendered by Defendants;

471.   Award Plaintiffs and the Classes their reasonable litigation expenses and attorneys' fees;

472.   Award Plaintiffs and the Classes pre and post-judgment interest to the maximum extent allowable by law; and

473.   Award such other and further legal or equitable relief as equity and justice may require.

## **<u>JURY DEMAND</u>**

Plaintiffs demand a jury trial on all issues in this action.

Respectfully submitted,

/s/ Donald W. Stewart
Donald W. Stewart
Attorney for Plaintiffs

<u>OF COUNSEL:</u>
Stewart & Stewart, PC
1021 Noble Street, Suite 110

Anniston, Alabama 36201
Phone: (256) 237-9311
Fax: (256) 237-0713

/s/ Greg W. Foster
Greg W. Foster

/s/ T. Dylan Reeves
T. Dylan Reeves
Attorneys for Plaintiffs

OF COUNSEL:
Stewart & Stewart, PC
P.O. Box 721
Bessemer, AL 35021
Phone: (205) 425-1166
Fax: (205) 425-5959
E-mail: greg@stewartandstewar.net; dreeves@stewartandstewart.net

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following, on this _____ day of _____, 2015:

Richard E. Smith
Jonathan W. Macklem
Jeremy L. Carlson
J. Paul Zimmerman
CHRISTIAN & SMALL LLP
*Counsel for the Hospital Defendant Class & the Clinic Defendant Class*

Wynn M. Shuford
Jackson R. Sharman, III
Jacob M. Tubbs
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
*Counsel for Defendant Community*

Daniel R. Warren
David A. Carney
Theodore J. Kobus, III
Jimmy D. Parrish
Paul G. Karlsgodt
BAKER & HOSTETLER LLP
*Counsel for Defendant Community Health Systems Professional Service Corporation*

135

*Health Systems, Inc.*

/s/ T. Dylan Reeves
Of Counsel